**Hortensia de ALLENDE, et al.,
Plaintiffs, Appellees,**

v.

**George P. SHULTZ, Secretary of State,
et al., Defendants, Appellants.**

No. 87–1469.

United States Court of Appeals,
First Circuit.

Heard Sept. 18, 1987.

Decided April 13, 1988.

Joel W. Nomkin, Appellate Staff, Civil Div., Dept. of Justice, with whom Michael Jay Singer, Appellate Staff, Civil Div., Dept. of Justice, Richard K. Willard, Asst. Atty. Gen., Washington, D.C., and Frank L. McNamara, Jr., Acting U.S. Atty., Boston, Mass., were on brief, for defendants, appellants.

Leonard B. Boudin, with whom Edward Copeland, Terry Gross, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., Nat. Emergency Civil Liberties Committee, New York City, Allan R. Rosenberg, Putnam, Bell & Russell, Boston, Mass., Steven R. Shapiro, American Civil Liberties Union, Arthur Eisenberg, New York Civil Liberties Union, New York City, and Margaret Crosby, American Civil Liberties Union, San Francisco, Cal., were on brief, for plaintiffs, appellees.

Before BOWNES and BREYER, Circuit Judges, and LAGUEUX,[*] District Judge.

BOWNES, Circuit Judge.

This case involves the statutory interpretation of Section 212(a)(27) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1182(a)(27) (1982). It addresses the power of the government under the Act to exclude aliens whose mere presence in the United States, in the judgment of the government, will pose potential foreign policy concerns. The instant dispute arises out of the exclusion from the United States of Hortensia de Allende under subsection 27, after Mrs. Allende applied for a nonimmigrant tourist visa in response to speaking invitations from various scholastic and community groups. The court below granted plaintiffs' motion for summary judgment, holding that the exclusion exceeded the statutory authority of the State Department. We agree that the government misapplied subsection 27 in its treatment of Mrs. Allende. We therefore affirm the judgment of the district court, although on the basis of somewhat different reasoning.

I. FACTUAL BACKGROUND

The underlying controversy dates to February 22, 1983, when Mrs. Allende applied for a nonimmigrant tourist visa to the United States. Mrs. Allende, the widow of Dr. Salvador Allende, the democratically elected president of Chile from 1970 to 1973, currently lives in exile in Mexico City. She

---

[*] Of the District of Rhode Island, sitting by desig- nation.

applied to the United States Embassy in Mexico City for an entry visa in response to an invitation from the Northern California Ecumenical Council (NCEC) to speak during a planned celebration of International Women's Week in San Francisco. The invitation from NCEC was followed by numerous requests for speaking engagements from both religious and educational institutions in California. Mrs. Allende intended to address those groups on various issues raised by the contemporary political and social situation in Latin America, including the role of women in the struggle for human rights, the plight of women in exile, and the different options available to the United States in its policies toward the nations of Latin America.

The United States Embassy found Allende ineligible to receive a visa because of her affiliation with the World Peace Council (WPC) and the Women's International Democratic Federation (WIDF). The consular official responsible for Allende's application cited a provision of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(28), which bars the admission of aliens who advocate communism or are affiliated with communist organizations.[1] The Department of State considers both the WPC and the WIDF to be international fronts for the Communist Party of the Soviet Union. Subsequent to its finding, the United States Embassy in Mexico City submitted Allende's application to the Department of State for an advisory opinion on whether a waiver of ineligibility should be sought pursuant to 8 U.S.C. § 1182(d)(3). That section provides for the admission of aliens otherwise excludible upon recommendation by the Secretary of State, as approved by the Attorney General.[2]

The waiver of subsection 28 ineligibility is controlled by the McGovern Amendment, 22 U.S.C. § 2691.[3] Under the Amendment, the Secretary of State should recommend a waiver of ineligibility for any alien denied a visa due to subsection 28 organizational affiliation unless the Secretary certifies to Congress that such a waiver would implicate the security interests of the United States.

The Department of State set aside the question of subsection 28 waiver. Undersecretary of State Lawrence Eagleburger issued an advisory opinion informing the Embassy at Mexico City that Mrs. Allende was ineligible for a visa under subsection 27—a provision which bars entry to the following class of aliens:

> Aliens who the consular officer or the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States.

---

1. Subsection 28 provides, in pertinent part, for the denial of visas to aliens

   who are members of or affiliated with ... the Communist or any other totalitarian party of any State of the United States, of any foreign state, or of any political or geographical subdivision of any foreign state [or] any section, subsidiary, branch, affiliate, or subdivision of any such association or party....

   8 U.S.C. § 1182(a)(28)(C).

2. 8 U.S.C. § 1182(d)(3) permits waiver of ineligibility for aliens excludible under one or more of the 33 categories detailed in Section 212(a) of the Immigration and Naturalization Act, 8 U.S.C. § 1182(a), with the exception of aliens excludible under subsections 27, 29 or 33.

3. Congress adopted the McGovern Amendment in 1977 in order to promote freedom of movement across international borders in accordance with the goals of the Helsinki Accords. The Amendment provides in pertinent part:

   [T]he Secretary of State should, within 30 days of receiving an application for a nonimmigrant visa by any alien who is excludible from the United States by reason of membership in or affiliation with a proscribed organization but who is otherwise admissible to the United States, recommend that the Attorney General grant the approval necessary for the issuance of a visa to such alien, unless the Secretary determines that the admission of such alien would be contrary to the security interests of the United States and so certifies to the Speaker of the House of Representatives and the chairman of the Committee on Foreign Relations of the Senate. Nothing in this section may be construed as authorizing or requiring the admission to the United States of any alien who is excludible for reasons other than membership in or affiliation with a proscribed organization.

8 U.S.C. § 1182(a)(27). Eagleburger set forth two reasons for the subsection 27 ineligibility of Allende: (1) her membership in and attendance at conferences of the WPC, and (2) his official determination that Allende's entry into the United States at the time of her application "would have been prejudicial to the foreign policy interests of the United States...." *See* Partially Declassified Affidavit of Lawrence S. Eagleburger, *reprinted in* Joint Appendix at 168, 171. Subsection 27 ineligibility may not be waived under 8 U.S.C. § 1182(d)(3). *See supra* note 2.

In August 1983, Mrs. Allende received further invitations from scholastic and civic organizations in the United States—including the Boston Area Council on Latin America (BACLA)—to address their members concerning Latin American affairs. Mrs. Allende accepted those invitations. The denial of her visa application, however, precluded her attendance and participation.

Plaintiffs filed suit in the United States District Court for the District of Massachusetts in December of 1983 to contest the visa denial. The named plaintiffs include not only Mrs. Allende, a symbolic party,[4] but also representative scholars and civic leaders who extended speaking invitations to Allende.[5] The complaint, which seeks declaratory and injunctive relief, charges that the interpretation of subsection 27 by the Department of State, and its application in regard to Mrs. Allende, exceed the scope of authority granted by the Immigration and Nationality Act and infringe upon the first amendment rights of plaintiffs to receive information as recognized in *Klein-*

*dienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972).

## II. PROCEDURAL HISTORY

The district court issued three memoranda and orders. Its first opinion considered and denied the government's motion to dismiss, or in the alternative, for summary judgment. *Allende v. Shultz,* 605 F.Supp. 1220 (D.Mass.1985). The second opinion concerned the question of mootness. *Allende v. Shultz,* 624 F.Supp. 1063 (D.Mass. 1985). And the third opinion, the subject of the current appeal, granted plaintiffs' motion for summary judgment. *Allende v. Shultz,* No. 83–3984–C (D.Mass. March 31, 1987) [Available on WESTLAW, 1987 WL 9764].

The initial opinion of the district court addressed three distinct issues: standing, subject matter jurisdiction and the sufficiency of the complaint. First, the court held that the denial of a visa to Mrs. Allende implicated plaintiffs' first amendment rights to receive information and ideas and thereby inflicted sufficient injury to meet the standing requirement. Second, the court held that government action in the area of foreign affairs is not immune from judicial scrutiny. And finally, the court found that the government had not met its burden of proof for dismissal or summary judgment since it had failed to advance a facially legitimate and bona fide reason for exclusion as required by *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576.

■ In its second memorandum and order, the court considered defendants' motion to dismiss for mootness. Defendants'

---

4. *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), established that an alien has no standing to bring a constitutional challenge to the denial of a visa, and that in a suit contesting such a denial, the inclusion of an alien as a party is purely symbolic. The Court stated: "It is clear that [the applicant] personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise." *Id.* at 762, 92 S.Ct. at 2581.

5. The complaint names the following persons, in addition to Allende, as plaintiffs: John Womack, Jr., Chairperson of the Department of History at Harvard University; Duncan Kennedy,

Professor of Law at Harvard Law School; Jack Spence, Professor of Political Science at the University of Massachusetts, Boston; Brian Smith, Professor of Political Science at the Massachusetts Institute of Technology; the Boston Area Council on Latin America; and the Northern California Ecumenical Council.

The complaint further names the following persons as defendants: George P. Shultz, Secretary of State; William French Smith, Attorney General of the United States; and Alan C. Nelson, Commissioner of the Immigration and Naturalization Service. Each is sued in his official capacity.

motion followed the issuance of a single entry visa to Mrs. Allende on October 4, 1985. The lower court held that despite the decision to grant Allende's request for admission, the government had failed to carry its burden as established by *County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979).[6] The court noted that plaintiffs' request for declaratory relief rested not merely on the denial of a visa to Allende but rather on the *policy* of applying subsection 27 to her application, and the government had not disavowed that policy. Further, the court held that even if the actual controversy had lapsed, nonetheless the case presented an issue capable of repetition yet evading review: Defendants' policy burdened plaintiffs' first amendment rights by precluding plaintiffs from planning speaking engagements for Allende, and yet any time plaintiffs challenged a particular visa denial, the

government could grant a visa and thereby evade judicial review. The court refused to sanction such a result.[7]

In its third and final opinion, the lower court considered cross motions for summary judgment. The government submitted a partially declassified version of the Eagleburger affidavit[8] which it argued satisfied the *Mandel* standard of a facially legitimate and bona fide reason for exclusion. In his affidavit, the Undersecretary of State testified that Allende belonged to the WPC, that the WPC acted as a covert instrument of Soviet policy to manipulate public opinion in the United States, that the Reagan Administration had decided to deny entry to WPC members, and that pursuant to that policy Eagleburger had determined that the admission of Allende to the United States would be contrary to the nation's foreign policy interests. The court found

---

6. *City of Los Angeles v. Davis*, 440 U.S. at 631, 99 S.Ct. at 1383, established two prerequisites for mootness:

   (1) it can be said that "there is no reasonable expectation...." that the alleged violation will recur ... and

   (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

   (Citations omitted).

7. On appeal, the government has not raised the question of mootness. Since mootness, however, is a threshold jurisdictional issue which this court may raise *sua sponte*, we have considered the question in light of recent developments. Although Mrs. Allende did receive a multiple entry visa valid through August 21, 1987, after the consideration of the motion to dismiss for mootness by the court below, the concerns which informed the decision of the district court continue to preclude a finding of mootness. Plaintiffs seek a declaratory judgment that the current *policy* of excluding aliens under subsection 27 upon the mere allegation that entry at a given time would prejudice foreign policy exceeds the authority granted under the Immigration and Nationality Act. Although the specific application of that policy against Allende in March 1983 is moot, the validity of that policy in general remains a live controversy. And since the existence of the policy continues to effect the actions of the plaintiffs who may reasonably expect that the government will oppose future plans to extend speaking invitations to Allende, we find the Article III case or controversy requirement satisfied. *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974)

(state policy concerning public assistance for strikers not moot upon conclusion of strike where "the challenged government activity ... is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties.")

Contrary to the view expressed in the concurrence, we do not think the recent passage of section 901 of the Foreign Relations Authorization Act, Pub.L. No. 100–204 (1987), affects this analysis. Section 901 limits the power of the government to exclude an alien from the United States based upon that individual's beliefs, associations or speech-related activities. The new provision does not address the entry versus activity distinction raised by the case at bar. Absent a ruling by this court, the government may persist in its current policy of excluding aliens upon the mere allegation that entry alone will adversely affect foreign policy. In his concurrence, Judge Breyer points out that the government has stated that future visa applications by Mrs. Allende "presumably would be approved." The government has not, however, revised its interpretation of subsection 27. The mere voluntary cessation of its challenged activity does not, in our opinion, moot the controversy. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

8. The partially declassified affidavit contained the same information as a document previously submitted by the government for *in camera* inspection, with the exception of one sentence which was partially excised in the public document.

the testimony inadequate under *Mandel* and granted summary judgment for the plaintiffs. Allende's exclusion, the court reasoned, rested squarely on her membership in a subsection 28 organization. Adopting the analysis of the United States Court of Appeals for the District of Columbia in *Abourezk v. Reagan*, 785 F.2d 1043 (D.C.Cir.1986), *aff'd mem.*, — U.S. —, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987), the court found that such membership could not also form the basis for subsection 27 exclusion.[9]

■ We agree that the government has failed to advance a sound basis for exclusion under subsection 27. Following established principles of statutory analysis, we find that the mere entry or presence of an alien does not constitute an activity within the meaning of subsection 27. The government may not exclude Allende on the bare assertion that her presence in the United States at a given time may prejudice foreign policy interests. We therefore affirm the judgment of the court below.

### III. SUBSECTION 27 EXCLUSION

The government argues that it acted well within the scope of its statutory authority in denying Mrs. Allende's visa application under subsection 27. Although the plain language of the statute provides for the exclusion of aliens who "seek to enter the United States solely, principally, or incidentally *to engage in activities* which would be prejudicial to the public interest, or endanger the welfare, safety or security of the United States" (emphasis added), the government contends that such language must be read to cover those situations in which *the mere act of entry itself* poses a threat to the public interest. The government asserts that both the statutory framework and the legislative history of the Immigration and Nationality Act support its interpretation. It notes that because subsection 29 provides for the exclusion of aliens who engage in activities "relating to espionage, sabotage, public disorder, or . . . other activity subversive to the national security,"[10] a narrow reading of subsection 27 would render it duplicative of subsection 29 in contravention of established principles of statutory construction. Moreover the government contends that the legislative history "unquestionably" supports a broad reading of subsection 27. *See* Brief of Defendants–Appellants at 28. Finally, the government argues that because the Department of State interpretation is reasonable, it should be accorded deference.

■ Plaintiffs contest that analysis on the basis of statutory construction. They argue that the language of subsection 27 clearly authorizes the denial of a visa *only* when the government has reason to believe that an alien intends to engage in certain proscribed activities *after entry*. We agree.

Any analysis of the meaning of a statutory provision must begin with " 'the language of the statute itself.' " *United States v. James*, 478 U.S. 597, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (quoting

---

9. The district court stated:

Where, as here, an alien-applicant fits within the statutory limits of subsection 28, in order to bypass it and exclude the alien under subsection 27, defendants bear the burden of establishing a reason that is separate and independent of the alien's membership in the subsection 28 organization.... Defendants argue that Mrs. Allende's attendance at, and delivery of speeches to, international conferences sponsored by the WPC and WIDF provides such a reason and is therefore a facially legitimate and *bona fide* reason for excluding her under subsection 27. I disagree. Such activities are merely incidental to Mrs. Allende's membership in those organizations and are not therefore a reason separate and independent of her membership. [Citations omitted].

10. Subsection 29 provides for the exclusion of:

Aliens with respect to whom the consular officer or the Attorney General knows or has reasonable ground to believe probably would, after entry, (A) engage in activities which would be prohibited by the laws of the United States relating to espionage, sabotage, public disorder, or in other activity subversive to the national security, (B) engage in any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States, by force, violence, or other unconstitutional means, or (C) join, affiliate with, or participate in the activities of any organization which is registered or required to be registered under section 786 of title 50....

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). The words must be given their ordinary meaning, *id.* (quoting *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982)), which are assumed to express the underlying legislative purpose. *Id.; accord I.N.S. v. Cardoza Fonseca,* — U.S. —, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) (the "ordinary and obvious meaning of the [words] is not to be lightly discounted") (citations omitted).

The language of subsection 27 clearly articulates the scope of the provision. Section 212(a) of the Immigration and Nationality Act defines 33 classes of excludible aliens. Although subsection 27 encompasses a broader range than many of the other provisions, it establishes clear criteria for exclusion: the responsible official must know or have reason to believe that the alien seeks entry to the United States to engage in harmful activities. In the instant case, the government has not alleged that Allende will engage in any such activities; it argues merely that her presence alone will trigger the subsection 27 standard of "prejudicial to the public interest." That interpretation would render superfluous unambiguous language contained in subsection 27; the statute makes clear the anticipation of post-entry activity as a prerequisite to exclusion. We simply fail to see how an alien can enter to engage in the act of entry. Reading the disputed language out of the provision would violate established principles of statutory construction. *See Montclair v. Ramsdell,* 107 U.S. (17 Otto) 147, 152, 27 L.Ed. 431 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."). *Accord South Car-*

*olina v. Catawba Indian Tribe,* 476 U.S. 498, 106 S.Ct. 2039, 2046 n. 22, 90 L.Ed.2d 490 (1986).

Viewing subsection 27 in the context of the other statutory classifications further clarifies its meaning. The 33 categories of aliens detailed in Section 212(a) of the Immigration and Nationality Act distinguish between status-based and conduct-based ineligibility. Subsection 28, which provides for the denial of visas to aliens belonging to or affiliated with certain organizations, renders a person ineligible based on status. Conversely, both subsections 27 and 29 focus on the anticipated activities of aliens upon entry to the United States and hence may be labeled conduct-based classifications. The inclusion of conduct-based language in certain provisions and its exclusion in others is not to be lightly disregarded:

> "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* [464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)] (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (CA5 1972)).

*I.N.S. v. Cardoza Fonseca,* 107 S.Ct. at 1213. In the instant case, Congress clearly distinguished between exclusion based on an alien's identity and exclusion based on an alien's activity.[11] To disregard that distinction would undercut the clear meaning of the statute.

■ Reading Section 212(a) of the Immigration and Nationality Act in its entirety not only clarifies the distinction between status and conduct, but it also reveals the interplay between the various subsections. *See Erlenbaugh v. United States,* 409 U.S. 239, 244, 93 S.Ct. 477, 480, 34 L.Ed.2d 446

---

11. As plaintiffs note in their brief, American constitutional law recognizes a fundamental distinction between belief and activity. *See, e.g., Brandenburg v. Ohio,* 395 U.S. 444, 448–49, 89 S.Ct. 1827, 1830, 23 L.Ed.2d 430 (1969) (overturning conviction where trial court failed to distinguish between mere advocacy and incite-

ment to action); *Reynolds v. United States,* 98 U.S. (8 Otto) 145, 166, 25 L.Ed. 244 (1878) ("Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.").

(1972) (noting "the principle that individual sections of a single statute should be construed together.") (footnote omitted). Each subsection creates a different and distinct ground for exclusion. Were we to accept the government's interpretation of subsection 27, it would render duplicative the provisions of subsection 28. Membership in a subsection 28 organization would be grounds not only for waivable exclusion under that provision, but also for nonwaivable exclusion under subsection 27 upon the allegation of prejudice to the public interest. "This construction, therefore, offends the well-settled rule of statutory construction that all parts of a statute, if at all possible, are to be given effect." *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973) (citations omitted). Restricting subsection 27 to its own terms avoids that result. Contrary to the contention of defendants, a literal reading of subsection 27 does not render it duplicative of subsection 29. Subsection 27 deals with a broad range of activities harmful to the public interest; subsection 29 deals more narrowly with specifically proscribed activities—primarily espionage and sabotage— which threaten the national security. Thus in *El–Werfalli v. Smith,* 547 F.Supp. 152 (S.D.N.Y.1982), the court upheld the exclusion of a Libyan national under subsection 27 where the alien sought entry to the United States in order to study aeronautics. The court accepted the government's argument that such study constituted a prejudicial activity within the meaning of subsection 27 since the knowledge gained might enable the alien to assist the civilian and military aircraft of Libya to the detriment of the interests of the United States. Such study would not present a ground for exclusion under subsection 29; it neither constitutes a proscribed activity nor does it threaten the internal security of the United States. Hence the two provisions cover different scenarios in a complementary, rather than a duplicative, fashion.[12]

Reading subsection 27 against the broader context of the entire statutory scheme also dispels any concern raised by defendants' argument that a literal reading will render the government powerless in a situation in which the mere entry of an alien might prejudice the public interest. Other provisions exist which grant the President vast power to exclude any individual alien or class of aliens whose entry might harm the national interest.[13] The spectre raised by defendants, therefore, of a government stymied by a restrictive interpretation of subsection 27 has no merit.[14] *Accord*

---

**12.** The government argues that the degree of activity involved in the instant case equals that present in *El–Werfalli. See* Reply Brief of Defendants–Appellants at 9. We find that reasoning unpersuasive. The alien in *El–Werfalli* sought to engage in an active course of study targeted at acquiring skills which might directly harm the interests of the United States. Conversely, the government has identified no activity which Mrs. Allende will engage in other than "the act of entry." We find the government's attempt to equate the "passive conduct" of studying with the act of entry to defy logic. *El–Werfalli* involved post-entry conduct. Here, the government's pleadings allege no post-entry conduct.

**13.** Section 212(f) of the Immigration and Nationality Act, 8 U.S.C. § 1182(f), provides:

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrant or nonimmigrants, or impose on the entry of

aliens any restrictions he may deem to be appropriate.

And Section 215 of the Immigration and Nationality Act, 8 U.S.C. § 1185(a)(11), provides:

Unless otherwise ordered by the President, it shall be unlawful—

(1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe....

**14.** The government contends that the issuance of a presidential proclamation may send a stronger diplomatic signal than intended. *See* Reply Brief for Defendants–Appellants at 8 n. 7. This argument distorts the legislative history of the Immigration and Nationality Act. The passage of the McGovern Amendment significantly reduced the discretion within the Department of State concerning waiver of subsection 28 ineligibility. Although the language of the statute is not clearly mandatory, its purpose was to reduce flexibility in the waiver decision so that the admission of an alien belonging to a subsec-

*Abourezk v. Reagan,* 785 F.2d at 1049 n. 2 ("The President's sweeping proclamation power ... provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the categories in section 1182(a).") (citation omitted).[15]

The plain language of subsection 27, as confirmed and clarified by the statutory context, renders further inquiry unnecessary. In *Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980), the Court stated: "[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.* at 108, 100 S.Ct. at 2056 (overturning agency interpretation of Consumer Product Safety Act).

In *Abourezk v. Reagan,* 785 F.2d 1043, the United States Court of Appeals for the District of Columbia Circuit considered a challenge to the meaning and scope of subsection 27 similar to the case at bar. The government denied visas to the plaintiffs in *Abourezk* under subsection 27, claiming that their entry into the United States would prejudice foreign policy. The court considered whether subsection 27 authorized exclusion upon such grounds. First it determined that the language of the statute itself supported plaintiffs' position: "A familiar canon of statutory construction cautions the court to avoid interpreting a statute in such a way as to make part of it meaningless.... This basic guide and the plain thrust of the language of subsection (27) ... weigh heavily against the government's reading." *Id.* at 1054 (citation omit-

ted); *accord id.* at 1066 (Bork, J., dissenting) ("Had we before us nothing but the language of the statute ... I might be inclined to adopt the construction proposed by the plaintiffs."). Despite the plain language of the statute, the *Abourezk* court went on to consider both the legislative history and agency practice. After a thorough review, the court found the legislative history inconclusive. *Id.* at 1054 ("The legislative history on this issue ... is terse and tugs in more than one direction."). *But see id.* at 1066 (Bork, J., dissenting) (finding support for government position in legislative history). Similarly, the majority found the administrative practice undeveloped and inconclusive. *Id.* at 1055–56. The court therefore remanded the case for further findings on the nature of agency practice.

▮ We find such inquiry into the administrative practice unnecessary. *Consumer Product Safety Commission* establishes the presumptive conclusiveness of the language of the statute. Here that language is clear and unambiguous, both standing alone and read in the context of the entire Act. *Cf. St. Luke's Hospital v. Secretary of Health and Human Services,* 810 F.2d 325, 331 (1st Cir.1987) ("[W]e simply read the statute to mean what it says; we interpret the language literally, and we find no initial ambiguity."). Because the legislative history does not establish a clearly expressed intent to the contrary, *see Abourezk,* 785 F.2d at 1054, we must enforce the literal meaning of the statute. Subsection 27 plainly requires a reasonable belief that an alien will engage in specific

tion 28 organization would not necessarily reflect a State Department "soft" on communism: "One effect of the provision would be to open the way to visits by Eurocommunist leaders and to Communist labor leaders without the executive branch having to make the politically difficult individual decisions which might imply a change in overall U.S. policy toward Communism." S.Rep. No. 194, 95th Cong., 1st Sess. 13, *reprinted in* 1977 U.S.Code Cong. & Admin. News 1625, 1635. By reading subsection 27 to permit status-based exclusions where the State Department determines that entry would harm the foreign policy interests of the United States,

we would reinsert the very discretion which the McGovern Amendment sought to diminish and hence would imbue subsection 27 exclusions with the very kind of diplomatic message which defendants fear.

15. Furthermore, as recognized by the court below, 605 F.Supp. at 1225, the State Department itself has warned against using subsection 27 as a catch-all provision for refusing visas to aliens who do not clearly fall into one of the other 32 categories.

activities harmful to the public interest.[16] Mere entry alone does not suffice. Absent the allegation of the requisite activities, the government may not exclude an alien under subsection 27.[17]

## IV. IDEOLOGICAL EXCLUSION

■ Interpreting subsection 27 to mean what it says, that the denial of a visa must reflect a reasonable belief that the applicant will engage in activity prejudicial to the public interest, does not end our inquiry. The question remains whether the government has met the activity requirement. Defendants argue that they seek the exclusion of Allende not because of her proposed activity, speechmaking, but because of the general harm to foreign policy created by her presence. That concern about foreign policy, however, is integrally related to the purpose of the proposed trip. The government concedes that had Allende applied for a visa to visit a sick relative, for example, the outcome of her application may well have been different. *See* Reply Brief for Defendants–Appellants at 19. That admission leads to the irrefutable conclusion that the government excluded Allende on the basis of the purpose of her trip. And that purpose was the delivery of speeches and the interchange of ideas.

The partially declassified affidavit of Undersecretary of State Eagleburger

makes clear that the government's opposition to the admission of Allende stems from her past speech-related activities pursuant to her WPC membership:

[T]he Administration determined in 1982 that persons who are members of, or affiliated with, the WPC and who seek to enter the United States to further Soviet policy objectives, should be denied entry to the United States, except in limited circumstances not relevant here. In 1977 Mrs. Allende addressed the WPC–sponsored World Assembly of Builders of Peace Conference in Warsaw and *assailed the U.S. in her speech.* In 1978 she attended the WPC–sponsored World Conference of Solidarity with Chile in Madrid and in 1981 the World Congress of Women sponsored by the WIDF. At this meeting *she spoke on women's issues and the need for nuclear disarmament.* A careful evaluation of Mrs. Allende's February 22, 1983, visa application, in light of the available information, led me to conclude that her entry into the United States at that time would have been prejudicial to the foreign policy interests of the United States and that her visa should be denied.

*See* Partially Declassified Affidavit of Lawrence S. Eagleburger, *reprinted in* Joint Appendix at 168, 171 (emphasis added).

**16.** The parties have not fully addressed the question of whether subsection 27 reaches activities harmful to foreign policy, nor is that question central to a resolution of the controversy. However, since plaintiffs contend that the term "prejudicial to the public interest" does not encompass foreign policy concerns, *see* Brief for Plaintiffs–Appellees at 18 n. 9, we note our disagreement. In *Abourezk,* the court dismissed a similar claim advanced by plaintiffs:

Only an isolationist view patently inconsistent with the reality of our late twentieth century world could account for a belief that the "public interest" and the "national welfare" were not dependent, in part, on the effective execution of our foreign policy. The court surely should not adopt on its own initiative such a counterintuitive interpretation of expansive statutory language, and the plaintiffs have identified nothing in the legislative history or administrative practice to suggest that Congress intended to exclude foreign policy concerns from consideration under subsection (27).

785 F.2d. at 1053. We agree with the analysis of the *Abourezk* court and find that subsection 27 allows the denial of visas to aliens whose activities in the United States would be prejudicial to the nation's foreign policy.

**17.** In its brief, the government attacks at great length the so-called rule of independence coined by the lower court. Both the District of Columbia Circuit and the court below held that the government may deny a visa to an alien under subsection 27 only where the threat to the public interest posed by entry is independent of the fact of membership in a subsection 28 organization and not merely in addition to such affiliation. *See Abourezk,* 785 F.2d at 1058; *Allende,* No. 83–3984–C, *reprinted in* Joint Appendix at 244, 255–56. Because we hold that subsection 27 ineligibility requires a reasonable belief that the applicant will engage in harmful *activities,* we need not enter this semantic debate. The requirement of prejudicial activities necessitates a showing of conduct-based concern apart from any status-based ground for exclusion.

The determination that her entry to the United States at the time of the application in question would be "prejudicial to the foreign policy interests of the United States" reflects a concern over the anticipated content of her proposed speeches on the basis of prior speeches. *Accord* Shapiro, *Ideological Exclusions: Closing the Border to Political Dissidents,* 100 HARVARD L.REV. 930, 941 (1987) ("The government's attempt to describe this justification in foreign policy terms does not alter the fact that the government's foreign policy concern flows directly from the anticipated content of [the alien's] speech in the United States and the anticipated reaction of American audiences to it....").

Having decided that some harmful activity is a prerequisite to subsection 27 exclusion, and that the activity at issue in the Allende exclusion is speech, we need go no further. The enactment of Section 901 of the Foreign Relations Authorization Act, Pub.L. No. 100–204, prohibits the government from excluding an alien from the United States based upon that individual's beliefs, associations or speech-related activities.[18] Therefore, since the government may not deny a visa to Mrs. Allende under the Immigration and Nationality Act upon the mere allegation of either harmful entry or harmful speech, we need not reach the issue of whether the denial of a visa for speech-related activities prior to the passage of Section 901 was unlawful.[19]

The decision of the district court awarding summary judgment to plaintiffs is *affirmed.*

BREYER, Circuit Judge (concurring).

In my view, this case is moot. Mrs. Allende complains of having been denied a visa in 1983. But, subsequently, the government granted her a multiple entry visa, valid through the end of 1987. And, the government now says that it is

advised by the State Department that, if Mrs. Allende were to file a visa application during 1988, the application presumably would be approved, just as all of her numerous applications have been approved both prior and subsequent to her 1983 denial.

Moreover, the government must concede it will not, and legally cannot, deny a visa to any other person whom Mrs. Allende could reasonably claim to represent in this litigation. The law of the United States has changed since the district court wrote its opinion. The law now prohibits denying a visa to an applicant "because of any past, current or expected beliefs, statements or associations which ... would be protected under the Constitution." Foreign Relations Authorization Act, Pub.L. No. 100–204, § 901 (1987). It is such a denial—the finding that Mrs. Allende's entry was prejudicial because of her past associations or speeches—that constitutes the subject matter of the present controversy.

Of course, the law of the United States may change again. Congress could fail to renew § 901. The Executive branch in 1989 or thereafter may revert to earlier practices. But, I do not see how this court can find (constitutionally speaking) a genuine "controversy" premised on the fact that present law *may* change. We do not know what will happen a year or so from now. We cannot predict that the law will change, that the next administration will enforce a new law according to a previous policy, and we cannot issue a declaratory judgment now about what the meaning of the law

---

**18.** Section 901 states in pertinent part:

Notwithstanding any other provision of law, no alien may be denied a visa or excluded from admission into the United States, subject to restriction or conditions on entry into the United States, or subject to deportation because of any past, current, or expected beliefs, statement, or associations which, if engaged in by a United States Citizen in the United States, would be protected under the Constitution of the United States.

**19.** We agree with the concurrence that a declaratory judgment on the issue of ideological exclusion has been rendered moot by the passage of section 901. Although subsection (d) of the statute limits the period of effectiveness to one year, and thus leaves open the question of whether the government will resume its past practice of excluding aliens based upon their speech-related activities when the statute lapses, we find the issue prudentially moot for the reasons specified by Judge Breyer.

will be, if it should happen to change. The "challenged government activity" in respect to associational or speech-related visa denials is highly "contingent;" prior policy is not a *"continuing* and brooding presence." *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 122–25, 94 S.Ct. 1694, 1698–1700, 40 L.Ed.2d 1 (1974) (emphasis added) (noting Supreme Court precedents that found cases *moot* when application of controversial statute required occurrence of series of events including act of Executive discretion); *see* § 901.

Even were this case not moot in terms of Article III's "case or controversy" requirement, it is "prudentially" moot. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1238 (1969 & Supp.1987). That is to say, the remedy sought, a declaratory judgment, is a discretionary remedy, and controlling Supreme Court precedent requires us to withhold that remedy here, "where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted." *A.L. Mechling Barge Lines, Inc. v. United States,* 368 U.S. 324, 331, 82 S.Ct. 337, 342, 7 L.Ed.2d 317 (1961). The District of Columbia Circuit, following *Mechling,* has specifically held that a declaratory judgment is not appropriately rendered when an "allegedly unlawful departmental practice ... is currently under review and may never recur." *Chamber of Commerce v. United States Department of Energy,* 627 F.2d 289, 292 (D.C.Cir.1980). The uncertainty surrounding the recurrence of the present challenged practice is greater, not smaller, than the uncertainty at issue in *Mechling* or *Chamber of Commerce.* Should the government renew its challenged practice, plaintiff, or others similarly situated, can obtain speedy court review at that time.

Although I do not believe it appropriate to issue a declaratory judgment in this case, the majority of the panel believes the contrary. I therefore add that I agree with the panel's opinion in respect to the merits.