**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,**

v.

**BATH IRON WORKS CORPORATION, et al., Respondents.**

No. 89–1126.

United States Court of Appeals, First Circuit.

Heard June 8, 1989.

Decided Sept. 20, 1989.

Joshua T. Gillelan, II, Dept. of Labor, Office of the Sol., with whom Jerry G. Thorn, Acting Sol. of Labor, Carol A. De Deo, Associate Sol., and J. Michael O'Neill, Washington, D.C., Counsel for Longshore, were on brief, for petitioner.

Stephen Hessert with whom Michelle Jodoin LaFond and Norman, Hanson & DeTroy, Portland, Me., were on brief, for respondents.

Before BREYER and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

BREYER, Circuit Judge.

Edwin Lebel painted ships; in 1971 he became disabled because of a work-related disease; and, in 1983, he died. As a result the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950 (1982), entitles his widow to

---

* Of the District of Massachusetts, sitting by designation.

death benefits. The legal question before us is who must pay that portion of the benefits resulting from a benefit-rate increase that took effect in 1972, when the LHWCA was amended to make it more generous. *See* LHWCA Amendments of 1972, Pub.L. No. 92–576, 86 Stat. 1251 (codified in scattered sections of 33 U.S.C. §§ 902–948a (1982)). (Subsequent amendments do not concern us.) If this portion of the benefit is a special "adjustment" that falls within the scope of § 10(h)(1) of the amended statute, the federal government and a special fund must pay its cost; if this portion of the benefit is not a special "adjustment," the employer (or his insurer) must pay. *See* 33 U.S.C. § 910(h)(1)–(2) (1982). (In the course of this opinion we refer frequently to the text of various statutory provisions. These provisions are set forth in an appendix.)

The answer to this legal question lies hidden in the words of a single sentence in § 910(h)(1) of the 1972 statute. That sentence, which we shall call the "gap-closing" sentence, says,

the compensation to which an employee or his survivor is entitled due to total permanent disability or death which commenced or occurred prior to [enactment of this subsection] shall be adjusted.

33 U.S.C. § 910(h)(1) (1982). Is the portion of benefits here at issue the type of "adjust[ment]" to which the sentence refers? After considering the 1972 amendments and their history, we conclude that this sentence does not cover the benefits paid to the survivor of a person who was injured before 1972, but who died after 1972. Consequently, the employer (or his insurer) must pay the disputed portion of the benefits.

### I

### BACKGROUND

The Longshoremen's and Harbor Workers' Compensation Act provides that employers must pay benefits to covered workers (or their survivors) who are disabled or killed by a work-related injury or illness. A worker seeking benefits under the LHWCA files notice of the injury with his employer, *see* 33 U.S.C. § 912 (1982), who must begin compensating the worker according to the terms of the statute, *see id.* § 914. If a dispute arises, either party notifies a deputy commissioner of the Office of Workers' Compensation Programs, *see id.* §§ 914(d), 919(a), who investigates and, if either party requests it, orders a hearing before an administrative law judge, *see id.* § 919(b)–(d). A party can appeal to the Benefits Review Board, *see id.* § 921(b)(3), and then to the United States courts of appeals, *see id.* § 921(c).

This case arose when Edwin Lebel's widow and son sought death benefits from Lebel's employer, Bath Iron Works (Bath), after Lebel's death in 1983. Bath refused to pay, but an ALJ, after a hearing, made an award. According to the death-benefits provision then in effect, 33 U.S.C. § 909 (1982), Lebel's widow and son were entitled to compensation at an initial rate of 66⅔ percent of his average weekly wages, which "shall be considered to have been not less than the applicable national average weekly wage" at the time of death, except that "the total weekly benefits shall not exceed the average weekly wages of the deceased." *Id.* § 909(e). Since 66⅔ percent of the national average weekly wage exceeded Lebel's average weekly wages of $173.58, the ALJ awarded the latter amount. The ALJ also awarded a yearly cost-of-living adjustment, pursuant to § 10(f) of the amended statute. *See id.* § 910(f).

The Benefits Review Board modified the award in an unpublished 1988 opinion. *Lebel v. Bath Iron Works*, BRB No. 86–429 (Nov. 30, 1988). Adhering to its decision in *Dennis v. Detroit Harbor Terminals, Inc.*, 18 B.R.B.S. 250 (1986), *aff'd sub nom. Director, OWCP v. Detroit Harbor Terminals, Inc.*, 850 F.2d 283 (6th Cir.1988), the Board held that § 10(h)(1) of the 1972 statute, which we shall call the "gap-closing" section, applied in this case of a pre–1972 injury resulting in a post–1972 death. Applying § 10(h)(1) and related § 10(h)(2)–(3), the Board held that Bath Iron Works was liable only for the first $36.75 per week of death benefits (the amount that, the Board

said, the employer would have paid under pre–1972 law), and that the remainder of the benefits, as well as the annual cost-of-living adjustment, must be paid partly out of a special fund financed by all employers covered by the LHWCA, and partly out of government appropriations. *See* 33 U.S.C. § 910(h)(1)–(3). The Director appeals from the Board's decision, contending that Bath Iron Works ought to pay the full amount of the death benefits, except for the cost-of-living adjustment, which the Director concedes that the special fund and the government must pay. We now reverse the decision of the Board. We agree with the Director that Bath must pay.

## II

### THE 1972 AMENDMENTS TO THE LHWCA

Congress enacted the complicated 1972 amendments to the LHWCA to expand its coverage, make benefit payments for total disability and death more generous, and to provide automatic cost-of-living adjustments (COLAs) to protect beneficiaries from inflation. Of particular concern to us are the "generosity" and "cost-of-living" adjustments. Once one understands how Congress rewrote the statute to achieve these purposes, it becomes easier to interpret properly the "gap-closing" sentence here at issue.

1. *Generosity.* The LHWCA, in both its pre- and post–1972 versions, requires the employer to compensate covered workers who are killed or disabled by work-related injuries. Benefits (and here we are concerned only with benefits that take the form of weekly payments) are calculated as a percentage of the worker's "average weekly wages" in the year preceding the injury. The statute also provides a ceiling on benefits, and, before 1972, that ceiling was very low. In 1972 Congress raised various benefit ceilings, increased benefit rates, and introduced assumptions about "average weekly wages" that made benefits more generous.

a. *Before 1972.* Before 1972, the statute fixed compensation for permanent total disability at 66⅔ percent of the worker's average weekly wages, *but* it imposed very low minimum and maximum benefit rates of $18 per week and $70 per week, respectively. *See* LHWCA Amendments of 1961, Pub.L. No. 87–87 § 1, 75 Stat. 203 (setting $70 per week maximum); Act of July 26, 1956, § 1, 70 Stat. 654 (setting $18 per week minimum). It fixed death benefits (weekly payments for a surviving spouse and dependent child) at 50 percent of the average weekly wage, *but* it imposed a very low ceiling (of $52.50) by specifying that "the average weekly wages of the deceased shall be considered to have been not more than $105." LHWCA Amendments of 1961, *supra,* § 2 (setting $52.50 ceiling).

b. *After 1972.* The 1972 amendments replaced the old $70 ceiling on total disability benefits with a new ceiling calculated as a percentage of the "national average weekly wage," a figure that the Secretary of Labor must determine each year. *See* LHWCA Amendments of 1972, Pub.L. No. 92–576, § 5(a), 86 Stat. 1251, 1252 (codified at 33 U.S.C. § 906(b)–(d) (1982)). The ceiling increased gradually from 125 percent of the national average weekly wage in 1972–1973 to 200 percent for years after 1975. *See id.* The amended statute raised the minimum compensation rate for total disability from $18 per week to 50 percent of the national average weekly wage or the worker's average weekly wage, whichever was less. *See id.* In regard to death benefits, the 1972 amendments made the statute more generous by increasing the percentage of the worker's "average weekly wage" payable to his survivors from 50 percent (for spouse with dependent child) to 66⅔ percent, *see id.,* §§ 10(b), 20(c)(2), 86 Stat. 1251, 1257, 1265 (codified at 33 U.S.C. § 909(b)–(c) (1982)), and by specifying that "the average weekly wages of the deceased shall be considered to have been not less than the applicable national average weekly wage," *id.,* § 10(d) (codified at 33 U.S.C. § 909(e) (1982)). It also removed the old benefits ceiling of $52.50, specifying instead that "the total weekly benefits shall not exceed the average weekly wages of the deceased." *Id.* These changes in the

calculation of death benefits, which are important in the context of this case, mean that, under the amended law, a surviving spouse and dependent child are always entitled to 66⅔ percent of the national average weekly wage at the time of death or the decedent's average weekly wage at the time of the injury, whichever is less.

2. *Inflation.* The 1972 amendments also helped beneficiaries by providing for automatic cost-of-living adjustments. Section 10(f) of the amended statute, which we shall call the "post–1972 COLA" provision, states that,

> Effective October 1 of each year, the compensation or death benefits payable for permanent total disability or death arising out of injuries sustained after [this section was enacted] shall be increased by ... [the extent to which the] national [average] weekly wage ... exceeds the ... national average weekly wage [for the preceding year]....

LHWCA Amendments of 1972, *supra,* § 11 (codified at 33 U.S.C. 910(f) (1982)).

3. *Pre–1972 injuries and benefits.* The drafters of the 1972 amendments decided that the newer, more generous statutory terms should also apply to pre–1972 cases of disability and death. Consequently, the amended statute (1) makes certain that workers injured before 1972 benefit from the "post–1972 COLA" provision, and (2) closes the "gap" (between benefits paid in pre–1972 cases and benefits paid in post–1972 cases) through a one-time adjustment. Finally, it provides that the COLAs and the one-time gap-closing adjustment applicable to pre-1972 cases be paid half from government appropriations and half from a special fund.

a. *Post–1972 inflation.* To make certain that pre–1972 cases obtained post–1972 cost-of-living adjustments, Congress added § 10(h)(3) to the statute, which says,

> For the purposes of subsection[ ] (f) [the "post–1972 COLA" provision] ... an injury which resulted in permanent total disability or death which occurred prior to [the date this section was enacted] shall be considered to have occurred on the day following such date.

LHWCA Amendments of 1972, *supra,* § 11 (codified at 33 U.S.C. § 910(h)(3) (1982)). These words call into play § 910(f), the "post–1972 COLA" provision, which otherwise (because of the words "injuries sustained after,") *see* p. 986, *supra,* would not apply. These words mean that, beginning in 1972, benefits paid for injuries that occurred before October 1972 receive the same post–1972 annual cost-of-living adjustment as benefits paid for injuries occurring after 1972.

b. *The Pre–1972 gap.* Congress also adjusted pre–1972 benefits to make up (1) for the fact that post–1972 benefits were more generous and (2) for inflation that took place between the time the worker began receiving compensation and 1972 (when the "post–1972 COLA" provision takes over). A worker who died before 1972 left his family no more than $52.50 per week (50 percent of his average weekly wage, which "shall be considered to have been not more than $105." Pub.L. No. 87–87, § 2, 75 Stat. 203 (1961)). The "post–1972 COLA" provision, § 10(f), provides the survivors receiving this $52.50 benefit with an annual increase that reflects inflation that takes place *after* 1972. *See* 33 U.S.C. § 910(f) (1982). But what about inflation that took place between 1966 and 1972? And what about the fact that the post–1972 death benefit is far more generous than the $52.50 the survivors began to receive in 1966?

Congress adjusted benefits in these pre–1972 cases to make them equivalent to post–1972 benefits in both respects by enacting the "gap-closing" section mentioned earlier, § 10(h)(1), p. 984, *supra.* That section applies to cases specified in its first sentence, the "gap-closing" sentence, which we set forth at the beginning of this opinion, p. 984, *supra.* The section provides a one-time adjustment of benefits paid in pre–1972 cases

> by designating as the employee's average weekly wage the applicable national average weekly wage ... and ... computing the compensation to which such employee or survivor would be entitled if the disabling injury or death had oc-

curred on the day [after this section's enactment] ... and ... subtracting therefrom the compensation to which such employee or survivor was entitled [just before this section was enacted].

33 U.S.C. § 910(h)(1) (1982). These words say: (1) Calculate what the survivor of the worker who died, say, in 1966 *would have received* if (a) his weekly wage had equaled the 1972 "national average" *and* (b) the benefit had been calculated under the new, 1972 statute. (2) Subtract from this amount what his survivors actually were receiving (probably the maximum death benefit, $52.50 per week). The result is the "adjustment."

c. *Government appropriations and the special fund.* Finally, Congress decided that payment for the enhanced benefits in pre–1972 cases would come half from government appropriations and half from a special fund to which employers would contribute. Section 10(h)(2) of the amended statute provides that,

> Fifty per centum of any additional compensation or death benefit paid as a result of the adjustment required by [subsections 10(h)(1) and 10(h)(3) ] ... shall be paid out of the special fund ... and 50 per centum shall be paid from appropriations.

33 U.S.C. § 910(h)(2) (1982). This section cross-references §§ 10(h)(1) and 10(h)(3), both discussed earlier, pp. 984, 986 *supra.* Section 10(h)(1) (the "gap-closing" section) closes the inflation and benefit-rate gap between pre–1972 and post–1972 cases; and § 10(h)(3) applies the "post–1972 COLA" provision to pre–1972 cases. Section 10(h)(2) makes the government and special fund liable for all benefit-enhancements in cases covered by §§ 10(h)(1) and 10(h)(3).

To summarize, the 1972 amendments a) made disability and death benefits more generous, b) indexed the benefits for post–1972 inflation, c) made certain that benefits tied to pre–1972 injuries were similarly indexed for post–1972 inflation, and d) made certain that benefits in pre–1972 cases were paid at the new statutory rates. It also provided that the government and a special fund would pay for "c" and "d." The exact scope of "d" is the issue in this case.

## III

### THE LEGAL ISSUE

Now we can turn to the sentence that governs the legal issue before us, the sentence in the "gap-closing" section that specifies to precisely which benefits the "gap-closing" adjustment applies. We shall repeat that sentence, emphasizing the language here relevant:

> ... the compensation to which an employee or his survivor is entitled *due to total permanent disability or death which commenced or occurred prior to* [enactment of this subsection] shall be adjusted.

33 U.S.C. § 910(h)(1) (1982). The issue in this case is whether this statutory provision, providing for a gap-closing adjustment, applies to the case of a worker who was injured before 1972, but who died after 1972. (The parties agree that, through § 10(h)(3), the "post–1972 COLA" provision, § 10(f), applies in this case, and that, because of the "government/fund pays" provision, § 10(h)(2), the government and fund will pay the cost of these annual adjustments.) If the "gap-closing" provision, § 10(h)(1), applies to this case, the government and fund must pay the cost of the adjustment, for the "government/fund pays" provision, § 10(h)(2), makes the government and special fund liable for all cases covered by § 10(h)(1). (As we shall see, if the "government/fund" does not pay, the employer must pay.)

In our view, this "gap-closing" sentence does *not* apply in the case of a worker, injured before October 1972, who died after October 1972. Our basic reason is that the language of the sentence clearly excludes that case from its coverage. The sentence says that the adjustment applies when the "total permanent disability or death ... commenced or occurred" before October 1972. The death of a worker who died after 1972 did not *"occur"* before 1972. And we do not see how such a death can be

said to have "commenced" before 1972. *But see Director, OWCP v. Detroit Harbor Terminals, Inc.,* 850 F.2d 283, 288 (6th Cir.1988). On the contrary, the place of the word "commenced" in the sentence suggests that it applies to the words "total disability" rather than the word "death." When the words of a statute are clear, a court must apply them. *See United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes."); *see also United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986); *CPSC v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Allende v. Schultz,* 845 F.2d 1111, 1116–17 (1st Cir. 1988).

We also believe (and this is why we have explained the statute in such detail) that the statute makes perfectly good sense interpreted this way. The main purpose of the 1972 amendments was to increase benefits under the LHWCA. Section 10(h)(1) helps carry out this purpose by increasing benefits for workers (or their survivors) who became entitled to benefits when the pre–1972 rates still applied. But the family of a worker injured before 1972 who dies after 1972 is entitled anyway to benefits at the generous, post–1972 rates (*i.e.,* 66⅔ percent of the decedent's salary, which "shall be considered to have been not less than the ... national average weekly wage" at the time of death, 33 U.S.C. § 909 (1982)). Neither party disputes that this is so, and we have held as much. *See Puig v. Standard Dredging Corp.,* 599 F.2d 467, 470 (1st Cir.1979) (death benefits under the LHWCA are calculated according to the death benefit provision in effect at the time of death). Since the family of a worker injured before 1972 who dies after 1972 is entitled to benefits at the post–1972 rates, no "gap" exists in his case, and the "gap-closing" provision, § 10(h)(1), simply does not apply.

The survivors of a worker injured before 1972 who dies after 1972 will, as we have previously pointed out, also receive post–1972 COLAs. Although the "post–1972 COLA" provision, § 10(f), applies only to deaths "arising out of injuries sustained after" 1972, special provision 10(h)(3) makes the "post–1972 COLA" provision apply also to deaths arising from pre–1972 injuries, for it applies when an "injury" (which resulted in permanent total disability or death) "occurred prior to" 1972. And, as we have also pointed out, § 10(h)(2) charges those post–1972 COLAs to the government and the special fund.

The result is not a statute that seems to contain drafting errors; rather, it is a statute that seems to have been drafted with care to carry out a complex purpose. It applies both 1972's "cost-of-living" and "generosity" adjustments to workers injured before 1972. In the case of a worker (or his survivors) receiving disability benefits at the pre–1972 rates, it charges the cost of applying post–1972 COLAs to the government and the special fund, and it closes the gap between the pre–1972 and post–1972 level of benefits by means of a one-time adjustment that is also charged to the government and the special fund. In the case of a worker injured before 1972 who dies after 1972, however, it does not pay for a "gap" adjustment from the "government/special fund" sources, because no "gap" exists in such a case. Death benefits in cases of pre–1972 injury, post–1972 death are calculated for the first time at the time of death. And, that calculation provides the survivors with benefits at the generous, post–1972 rates.

The statute's language is complex, but the problem with which it tries to deal is complex as well, and we cannot find any obvious drafting mistake in the language. Faced with language that is fairly clear and a statute that makes reasonable sense when one gives the statute's words their natural meaning, we must apply the statute as it is written. Bath makes three contrary arguments. First, Bath argues that the statute's legislative history shows that Congress recognized that increasing benefits in respect to persons injured before 1972 meant requiring insurance com-

panies to pay more money than they had calculated they would have to pay when they set their premiums; and, for this reason, Congress intended to pay for such increases from government appropriations and the special fund. Bath adds that, in this respect, a pre–1972–injury, post–1972–death case poses as much of a "premium calculation" problem as any other upward adjustment in benefits for pre–1972 injuries.

The problem with Bath's argument, however, is that the legislative history does not offer it much support. For one thing, the House and Senate Reports on the bill state in identical terms that it adds a separate provision "to increase future benefits to ... those people *who have been* receiving compensation or benefits for total disability or death...." *See* H.R.Rep. No. 1441, 92d Cong., 2d Sess. 3 (1972), *reprinted in* 1972 U.S.Code Cong. & Admin. News 4698, 4702 [hereinafter *House Report*]; S.Rep. No. 1125, 92d Cong., 2d Sess. 6 (1972) [hereinafter *Senate Report*] (emphasis added). The italicized words obviously do not include those who were not yet dead as of 1972. Similarly, the House Report states that the "uses to which the special fund may be put" have been expanded to include adjustments "for permanent total disabling injuries or deaths *occurring prior to the date of enactment.*" *House Report* at 18, 1972 U.S.Code Cong. & Admin. News at 4715 (emphasis added). Again, the italicized words do not encompass post–1972 deaths. In a section-by-section analysis of the bill, the Senate Report states, "Subsection [10](h)(1) provides that employees or survivors *already receiving payments* under the Act as a result of total permanent disability or death, would have their future compensation adjusted...." *Senate Report* at 22. And Congressman Steiger, describing "costs to the Federal Government" from the bill on the floor of the House, explained that government appropriations would pay for half "the increase in benefits for those persons who ... *are* widows or survivors ... *prior* to enactment of this bill." 118 Cong. Rec. 36,386 (Oct. 14, 1972) (emphasis added). Indeed, even the em-

ployers' representative who first suggested to Congress that it update benefits in pre–1972 cases referred to "those employees ... who are permanently totally disabled and the widows of employees ... on the rolls as of [1972]." Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972: Hearings on S. 2318, 525 & 1547 Before the Subcomm. on Labor of the Senate Committee On Labor and Public Welfare, 92d Cong., 2d Sess. 172 (1972) [hereinafter, *Hearings* ] (statement of Ralph Hartman, Asst. Manager, Safety and Workmen's Compensation Division, Bethlehem Steel Corp.). All these descriptions of the "gap-closing section," § 10(h)(1), suggest that Congress intended it only to adjust disability benefits for pre–1972 injuries, and to adjust death benefits for pre–1972 deaths. None of the congressional material implies that § 10(h)(1) was intended also to adjust death benefits in pre–1972 injury, post–1972 death cases.

For another thing, as Bath correctly points out, Congress did hear testimony that imposing "retroactive" benefit adjustments on employers would make it difficult for insurers to set premium rates. One industry witness, for example, argued that "retroactive increases in the weekly compensation rates" would create "problems which we believe are insurmountable insofar as the fixing of insurance premium rates or the setting of reserves for self-insurors [sic] under the Act are concerned." *Hearings* at 342 (statement of Edward D. Vickery, Esq.). And Secretary of Labor James Hodgson urged the committee to consider "whether there is a need to establish a special fund to compensate insurers for increased benefit payments." *Hearings* at 32. *But* both these witnesses were referring to the "post–1972 COLA" provision as applied to cases of *post–1972 injury*; neither was commenting on the "gap-closing" provision, § 10(h)(1), or the provision applying "post–1972 COLAs" to cases of pre–1972 injury, § 10(h)(3), which were not added to the proposed legislation until several months later. Thus, no witness ever expressed the concern that imposing the new death benefit rates in pre–1972

injury cases would present insurance problems.

Finally, Congress has often awarded benefit increases or given the benefit of more generous legal rules to those injured in the past even though the employer or insurer might have to foot the bill. On the three previous occasions when Congress raised death benefits under the LHWCA, in 1948, 1956, and 1961, it expressly provided that the new death benefit would apply to all deaths occurring after the amendments took effect, *see* LHWCA Amendments of 1961, Pub.L. No. 87–87, § 4, 75 Stat. 203 (1961); Act of July 26, 1956, § 9, 70 Stat. 655; Act of June 24, 1948, § 6, 62 Stat. 302, but it did not compensate employers for the increased benefit payments. After the 1948 amendments, several courts rejected challenges to the application of the new death benefit rates to pre-amendment injury cases, *see, e.g., Travelers Ins. Co. v. Toner,* 190 F.2d 30, 31 (D.C.Cir.) (per curiam), *cert. denied,* 342 U.S. 826, 72 S.Ct. 48, 96 L.Ed. 624 (1951); *Hampton Roads Stevedoring Corp. v. O'Hearne,* 184 F.2d 76, 78–81 (4th Cir.1950); *Penn Jersey Welding Co. v. Lowe,* 183 F.2d 936, 937 (3d Cir.1950), and no similar challenges to the 1956 or 1961 amendments have come to our attention. Likewise, when Congress again amended the death benefit rates in 1984, it said that the new rates "shall apply with respect to any death after the date of enactment." *See* LHWCA Amendments of 1984, Pub.L. No. 98–426, §§ 28(d), 98 Stat. 1639. Similarly, the new "unrelated death" provision of the 1972 statute provided, for the first time, that an employer must pay death benefits to an injured employee even if the employee "dies from causes other than the [employment-related] injury." LHWCA Amendments of 1972, Pub.L. No. 92–576, § 5(d), 86 Stat. 1251, 1253 (codified at 33 U.S.C. § 909 (1982)), *repealed by* LHWCA Amendments of 1984, Pub.L. 98–426, § 9(a), 98 Stat. 1639, 1647. Courts have consistently upheld application of this provision to pre–1972 injury, post–1972 death cases, relying on the general rule that an employer must pay death benefits under the law in effect at the time of death, regardless of the date of injury.

*See, e.g., Travelers Ins. Co. v. Marshall,* 634 F.2d 843, 847 (5th Cir.1981); *Puig v. Standard Dredging Corp.,* 599 F.2d at 469–70; *Todd Shipyards Corp. v. Witthuhn,* 596 F.2d 899, 901–02 (9th Cir.1979); *Pennsylvania Nat'l Mutual Casualty Ins. Co. v. Spence,* 591 F.2d 985, 986 (4th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979). The language in § 10(h)(1) indicates that Congress once again did not intend to compensate employers or their insurers for post-amendment death benefits linked to pre-amendment injuries. The legislative history is nowhere near strong enough to warrant a conclusion that Congress meant to do something other, in respect to post–1972 deaths, than what this language says. If this language was a drafting error, the time for employer representatives to catch, and to correct, that error was before the bill became law, not after.

Second, Bath points to a line of Board decisions, accepted as correct by the Director, which holds that the "gap-closing" sentence (making applicable the "gap-closing" section and the § 10(h)(2) "government/fund pays" provision) applies to an employee whose pre–1972 injury results in a post–1972 *total permanent disability. See Silberstein v. Service Printing Co.,* 2 B.R.B.S. 143 (1975); *see also Verderane v. Jacksonville Shipyards, Inc.,* 14 B.R.B.S. 220 (1981) ("[W]here claimant is injured prior to the date of enactment of the 1972 amendments and disabled after that date, he is treated as if the injury and disability occurred pre-amendment."); *Hernandez v. Base Billeting Fund,* 13 B.R.B.S. 214 (1980), *modified on reconsideration,* 13 B.R.B.S. 220 (1981); *Mitchell v. Lake Charles Stevedores, Inc.,* 5 B.R.B.S. 777 (1977). At first blush, the gap-closing sentence would seem not to apply to these cases, since it covers only "total permanent disability ... which commenced ... prior to [enactment]," 33 U.S.C. § 910(h)(1) (1982). If the "gap-closing" sentence is read to cover pre–1972 injury, post–1972 *permanent total disability* cases, Bath asks, why not pre–1972 injury, post–1972 *death* cases?

The answer is that the "gap-closing" sentence *must* be read to cover workers injured before 1972 who become permanently and totally disabled after 1972 in order to effectuate a basic purpose of the 1972 amendments, namely, to close the inflation and "generosity" gap between benefits paid at pre–1972 rates and those paid at post–1972 rates. To understand why this is so, one must refer back to our description of the 1972 amendments that increased benefits for permanent total disability. *See* pp. 985–86, *supra.* These amendments simply raised the maximum benefit from $70 per week to 200 percent of the national average weekly wage, and raised the minimum benefit from $18 per week to the lesser of 50 percent of the national average and the worker's average weekly wage. *See* 33 U.S.C. § 906(b) (1982). They did not, however, change the basic formula for calculating the benefit, namely, 66⅔ percent of the worker's actual average weekly wage at the time of injury. *See id.* § 908 ("Compensation for ... total disability adjudged to be permanent [is] ... 66⅔ per centum of the [worker's] average weekly wages...."); *id.* § 910 ("Except as otherwise provided in this chapter, the average weekly wages of the injured employee at the time of the injury shall be taken as the basis on which to compute compensation....") Aside from the new minimum benefit provision, § 6(b)(2), which in many cases (*i.e.,* where the worker's pre–1972 wages were extremely low) will not be of much help, the *only* language in the 1972 statute that would adjust this pre–1972 wage upward for purposes of calculating permanent total disability payments is the language found in the "gap-closing" section, § 10(h)(1). Thus, to make the permanent total disability benefits of a worker injured before 1972 commensurate with those of a worker injured after 1972, one must find authorization in the "gap-closing" section or one cannot find it at all. (One exception to this statement is the worker whose pre–1972 average weekly wage *exceeded* the 1972 national average weekly wage. Such a worker would be better off if his benefits were simply recalculated according to the post–1972 rates,

rather than adjusted according to the formula in § 10(h)(1), since § 10(h)(1) assumes for purposes of adjustment that the worker's average weekly wage was equal to the 1972 national average weekly wage. The existence of § 10(h)(1), however, whose clear purpose is to close the benefit-rate and inflation "gap" in cases of pre–1972 injury, indicates that Congress thought that cases like these would be relatively rare. And, the Board and courts have consistently held that § 910(h)(1) was meant to be the sole method of adjustment in cases of pre–1972 injury. *See, e.g., Landrum v. Air America, Inc.,* 534 F.2d 67, 69–70 (5th Cir.1976); *Lebel v. Bath Iron Works Corp.,* 3 B.R.B.S. 216 (1976), *aff'd,* 544 F.2d 1112 (1st Cir.1976).)

In this respect the post–1972 provision for calculating death benefits, § 9, is critically different. If the "gap-closing" section, 10(h)(1), does not apply to a pre–1972 injury, post–1972 death case, the decedent's survivors will nonetheless receive benefits at generous post–1972 rates (though the employer will pay them), because 9(e) calculates death benefits as a percentage of the worker's average weekly wage *at the time* of his (*post–*1972) *death,* not his *pre–*1972 *injury;* and it further specifies that these wages "shall be considered to have been not less than the applicable national average weekly wage" at the time of death. One must simply reread the relevant sections, which we have discussed several times. *See* pp. 985–87, *supra;* Appendix, *infra,* to see how this is so.

To summarize, if one reads the "gap-closing" sentence to exclude workers injured before 1972 who die after 1972, the result is simply that the entire death benefit, calculated according to the generous, post–1972 rates, must be paid by the employer, instead of part being paid by the government and the special fund. But, if one reads that sentence to exclude workers whose post–1972 disabilities result from pre–1972 injuries, the result is that these workers would not benefit from the "generosity" and inflation adjustments made to the 1972 statute. The latter outcome runs far more strongly contrary to the statute's

basic "benefit update" purposes than does the former.

At the same time, the words of the "gap-closing" sentence can be read to include the post–1972 disability case and exclude the post–1972 death case. That sentence brings within the reach of § 10(h)(1) cases of "total permanent disability or death which commenced" prior to the enactment of the subsection in 1972. 33 U.S.C. § 910(h)(1) (1982). It is more natural to think of a post–1972 total disability arising out of a pre–1972 injury as having "commenced" before 1972 than it is to think of a post–1972 death as having "commenced" before 1972. The *next* sentence in the "gap-closing" section reinforces this interpretation. That sentence, which explains how to calculate the adjustment, refers to the benefit that the employee or survivor would be entitled to "if the disabling *injury* or death" *had occurred after 1972. Id.* The drafter of these words seems to have assumed that post–1972 injuries and deaths would be compensated at the new, more generous rates (and, of course, they are, see §§ 6, 8, 9); but the drafter also seems to have assumed that workers whose disability resulted from a pre–1972 injury would be in need of a § 10(h)(1) adjustment (and, as we explained above, they are). Given the stronger need, rooted in the statute's purpose, to make the "gap-closing" sentence apply to the pre–1972 injury, post–1972 permanent total disability case, and given the difference in language that makes such an interpretation possible, we do not find the anomaly to which Bath points particularly serious. That is to say, it still makes sense to interpret the "gap-closing" sentence to mean what it seems to say in respect to post–1972 deaths, despite a more generous reading of other language in the sentence in respect to post–1972 permanent total disabilities.

Third, Bath points to *Director, OWCP v. Detroit Harbor Terminals, Inc.,* 850 F.2d 283 (6th Cir.1988), *aff'g Dennis v. Detroit Harbor Terminals, Inc.,* 18 B.R.B.S. 250 (1986), in which the Court of Appeals for the Sixth Circuit accepted the interpretation of the statute that Bath now urges upon us. For the reasons set forth above,

however, we find the dissent's view in that case more convincing. *See id.* at 292–94 (Nelson, J., dissenting). We do not believe that the language and purpose of the 1972 statute permit the interpretation for which Bath argues. Rather, we conclude that Congress intended what the statute says and it wrote its language accordingly.

Because we hold that the Board erred by applying § 10(h)(1) to this case, we need not address the Director's additional contention that the Board miscalculated the benefits due under that section.

For the reasons given above, the determination of the Benefits Review Board is

*Vacated and Remanded for further proceedings consistent with this opinion.*

## APPENDIX

Selected provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1982):

**33 U.S.C. § 906.  Compensation.**

(a) * * *

(b)(1) Except as provided in subsection (c) of this section, compensation for disability shall not exceed the following percentages of the applicable national average weekly wage as determined by the Secretary under paragraph (3):

(A) 125 per centum or $167, whichever is greater, during the period ending September 30, 1973.

(B) 150 per centum during the period beginning October 1, 1973, and ending September 30, 1974.

(C) 175 per centum during the period beginning October 1, 1974, and ending September 30, 1975.

(D) 200 per centum beginning October 1, 1975.

(2) Compensation for total disability shall not be less than 50 per centum of the applicable national average weekly wage determined by the Secretary under paragraph (3), except that if the employee's average weekly wages as computed under section 910 of this title are less than 50 per centum of such national average weekly

wage, he shall receive his average weekly wages as compensation for total disability.

(3) As soon as practicable after June 30 of each year, and in any event prior to October 1 of such year, the Secretary shall determine the national average weekly wage for the three consecutive calendar quarters ending June 30. Such determination shall be the applicable national average weekly wage for the period beginning with October 1 of that year and ending with September 30 of the next year. The initial determination under this paragraph shall be made as soon as practicable after October 27, 1972.

\* \* \* \* \* \*

### 33 U.S.C. § 908. Compensation for disability.

Compensation for disability shall be paid to the employee as follows:

(a) Permanent total disability: In case of total disability adjudged to be permanent 66 2/3 per centum of the average weekly wages shall be paid to the employee during the continuance of such total disability. \* \* \*

\* \* \* \* \* \*

### 33 U.S.C. § 909. Compensation for death.

If the injury causes death, or if the employee who sustains permanent total disability due to the injury thereafter dies from causes other than the injury, the compensation shall be known as a death benefit and shall be payable in the amount and to or for the benefit of the persons following:

(a) Reasonable funeral expenses not exceeding $1,000.

(b) If there be a widow or widower and no child of the deceased, to such widow or widower 50 per centum of the average wages of the deceased, during widowhood, or dependent widowerhood, with two years' compensation in one sum upon remarriage; and if there be a surviving child or children of the deceased, the additional amount of 16⅔ per centum of such wages for each such child; in the case of the death or remarriage of such widow or widower, if there be one surviving child of the deceased employee, such child shall have his compensation increased to 50 per centum of such wages, and if there be more than one surviving child of the deceased employee, to such children, in equal parts, 50 per centum of such wages increased by 16⅔ per centum of such wages for each child in excess of one: *Provided,* That the total amount payable shall in no case exceed 66⅔ per centum of such wages. \* \* \*

\* \* \* \* \* \*

(e) In computing death benefits the average weekly wages of the deceased shall be considered to have been not less than the applicable national average weekly wage as prescribed in section 906(b) of this title but the total weekly benefits shall not exceed the average weekly wages of the deceased.

\* \* \* \* \* \*

### 33 U.S.C. 910. Determination of pay.

Except as otherwise provided in this chapter, the average weekly wage of the injured employee at the time of the injury shall be taken as the basis upon which to compute compensation and shall be determined as follows:

(a) If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same or another employer, during substantially the whole of the year immediately preceding his injury, his average annual earnings shall consist of three hundred times the average daily wage or salary for a six-day worker and two hundred and sixty times the average daily wage or salary for a five-day worker, which he shall have earned in such employment during the days when so employed.

\* \* \* \* \* \*

(d) The average weekly wages of an employee shall be one fifty-second part of his average annual earnings.

\* \* \* \* \* \*

(f) Effective October 1 of each year, the compensation or death benefits payable for permanent total disability or death arising out of injuries sustained after October 27, 1972, shall be increased by a percentage equal to the percentage (if any) by which the applicable national weekly wage for the

period beginning on such October 1, as determined under section 906(b) of this title, exceeds the applicable national average weekly wage, as so determined, for the period beginning with the preceding October 1.

(g) The weekly compensation after adjustment under subsection (f) of this section shall be fixed at the nearest dollar. No adjustment of less than $1 shall be made, but in no event shall compensation or death benefits be reduced.

(h)(1) Not later than ninety days after October 27, 1972, the compensation to which an employee or his survivor is entitled due to total permanent disability or death which commenced or occurred prior to October 27, 1972, shall be adjusted. The amount of such adjustment shall be determined in accordance with regulations of the Secretary by designating as the employee's average weekly wage the applicable national average weekly wage determined under section 906(b) of his title and (A) computing the compensation to which such employee or survivor would be entitled if the disabling injury or death had occurred on the day following October 27, 1972, and (B) subtracting therefrom the compensation to which such employee or survivor was entitled on October 27, 1972; except that no such employee or survivor shall receive total compensation amounting to less than that to which he was entitled on October 27, 1972. Notwithstanding the foregoing sentence, where such an employee or his survivor was awarded compensation as the result of death or permanent total disability at less than the maximum rate that was provided in this chapter at the time of the injury which resulted in the death or disability, then his average weekly wage shall be determined by increasing his average weekly wage at the time of such injury by the percentage which the applicable national average weekly wage has increased between the year in which the injury occurred and the first day of the first month following October 27, 1972. Where such injury occurred prior to 1947, the Secretary shall determine, on the basis of such economic data as he deems relevant, the amount by which the employee's average weekly wage shall be increased for the pre-1947 period.

(2) Fifty per centum of any additional compensation or death benefit paid as a result of the adjustment required by paragraphs (1) and (3) of this subsection shall be paid out of the special fund established under section 944 of this title, and 50 per centum shall be paid from appropriations.

(3) For the purposes of subsections (f) and (g) of this section an injury which resulted in permanent total disability or death which occurred prior to October 27, 1972, shall be considered to have occurred on the day following such date.