08-0826-cv
American Academy v. Napolitano

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2008

Heard: March 24, 2009                    Decided: July 17, 2009
                    Docket No. 08-0826-cv

- - - - - - - - - - - - - - - - - - - - - - - - -
AMERICAN ACADEMY OF RELIGION, AMERICAN
ASSOCIATION OF UNIVERSITY PROFESSORS, PEN
AMERICAN CENTER, and TARIQ RAMADAN,
        Plaintiffs-Appellants,

                v.

JANET NAPOLITANO, in her official capacity
as Secretary of the Department of Homeland
Security, and HILLARY RODHAM CLINTON, in
her official capacity as Secretary of State,[*]
        Defendants-Appellees.
- - - - - - - - - - - - - - - - - - - - - - - - -

Before: FEINBERG, NEWMAN, and RAGGI, Circuit Judges.

        Appeal from the December 20, 2007, judgment of the United States

District Court for the Southern District of New York (Paul A. Crotty,

District Judge), granting summary judgment to Defendants-Appellees on

Plaintiffs-Appellants' claim that the denial of a visa for Tariq

Ramadan, an Islamic scholar, violated the First Amendment rights of

---

[*]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Janet
Napolitano is automatically substituted for former Secretary of the
Department of Homeland Security, Michael Chertoff, and Hillary Rodham
Clinton, for former Secretary of State, Condoleeza Rice, as Appellees
in this case.

the Plaintiffs-Appellants.  The visa was denied on the ground that Ramadan's contributions to a charity that had supplied funds to Hamas were "material support" to a terrorist organization (the charity).

The Court of Appeals concludes that the District Court had jurisdiction to consider the claim, despite the doctrine of consular nonreviewability; the statutory provision expanding visa ineligibility to those who contributed funds to an undesignated terrorist organization before the provision was enacted was validly applied to Ramadan; the knowledge requirement of the statute required the consular officer to find that Ramadan knew his contributions provided material support; the consular officer was required to confront Ramadan with the allegation against him and afford him the subsequent opportunity to demonstrate by clear and convincing evidence that he did not know, and reasonably should not have known, that the recipient of his contributions was a terrorist organization; and the record was unclear whether the consular officer had done so.

Vacated and remanded.

> Jameel Jaffer, New York, N.Y. (Melissa Goodman, Nasrina Bargzie, Judy Rabino-vitz, Lucas Guttentag, American Civil Liberties Union Foundation, New York, N.Y.; Arthur N. Eisenberg, New York Civil Liberties Union Foundation, New York, N.Y.; Claudia Slovinsky, New York, N.Y.; Leon Friedman, New York, N.Y., on the brief), for Plaintiffs-Appellants.
>
> Davis S. Jones, Asst. U.S. Atty., New

-2-

York, N.Y. (Michael J. Garcia, U.S. Atty., Kristin L. Vassallo, Sarah S. Normand, Asst. U.S. Attys., New York, N.Y., on the brief), for Defendants-Appellees.

(Charles S. Sims, Proskauer Rose LLP, New York, N.Y., for amici curiae American Ass'n for the Advancement of Slavic Studies, American Booksellers Foundation for Free Expression, American Studies Ass'n, Ass'n of American Law Schools, Ass'n of American Publishers, Ass'n of American University Presses, College Art Ass'n., Latin American Studies Ass'n, Middle East Studies Ass'n, Nat'l Coalition Against Censorship, in support of Plaintiffs-Appellants.)

JON O. NEWMAN, Circuit Judge.

This appeal concerns a First Amendment challenge to the denial of a visa. Three organizations, Plaintiffs-Appellants the American Academy of Religion ("AAR"), the American Association of University Professors ("AAUP"), and PEN American Center, appeal from the December 20, 2007, decision of the District Court for the Southern District of New York (Paul A. Crotty, District Judge), granting summary judgment to then-Defendants-Appellees Michael Chertoff, former Secretary of the Department of Homeland Security ("DHS"), and Condoleeza Rice, former Secretary of State, sued in their official capacities. The organizations alleged that the denial of a visa to Tariq Ramadan, an Islamic scholar, violated their First Amendment right to have Ramadan share his views with the organizations and with the public in this

-3-

country. The Supreme Court has recognized a First Amendment right to "hear, speak, and debate with" a visa applicant. See Kleindienst v. Mandel, 408 U.S. 753 (1972). Ramadan is also a Plaintiff-Appellant, but because he has no constitutional right to a visa, see id. at 762, he is what the organizational plaintiffs in Mandel called a "symbolic" plaintiff. See id.

The Government contends that the visa was properly rejected on the ground that Ramadan's contributions to a charity, the Association de Secours Palestinien ("ASP"), which provided some financial support to Hamas, rendered him inadmissible under subsection 212(a)(3)(B)(i)(I) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(3)(B)(i)(I) (2006),[1] for having "engaged in a terrorist activity" by providing "material support," § 1182(a)(3)(B)(iv)(VI)(dd), to a "terrorist organization," § 1182(a)(3)(B)(vi)(III), i.e., ASP.

We conclude that the District Court had jurisdiction to consider the claim, despite the doctrine of consular nonreviewability; the statutory provision expanding visa ineligibility to those who contributed funds to an undesignated terrorist organization before the provision was enacted was validly applied to Ramadan; the knowledge

---

[1]All references to provisions of the INA will be to the relevant subsections of section 1182 of Title 8 of the 2006 edition of the United States Code, unless otherwise noted.

requirement of the statute required the consular officer to find that Ramadan knew his contributions provided material support; and the consular officer was required to confront Ramadan with the allegation against him and afford him the subsequent opportunity to demonstrate by clear and convincing evidence that he did not know, and reasonably should not have known, that the recipient of his contributions was a terrorist organization. Finally, exercising the limited review permitted by Mandel, we conclude that the record does not establish that the consular officer who denied the visa confronted Ramadan with the allegation that he had knowingly rendered material support to a terrorist organization, thereby precluding an adequate opportunity for Ramadan to attempt to satisfy the provision that exempts a visa applicant from exclusion under the "material support" subsection if he "can demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization." § 1182(a)(3)(B)(iv)(VI)(dd). We therefore remand for further proceedings.

## Background

The statutory framework. The INA renders inadmissible, and therefore ineligible for a visa, see § 1182(a), an alien who has "engaged in a terrorist activity." § 1182(a)(3)(B)(i)(I). To "engage in terrorist activity" is defined to include:

> (VI) to commit an act that the actor knows, or

-5-

reasonably should know, affords material support, including . . . funds . . .--

        (aa) for the commission of a terrorist activity;

        (bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

        (cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

        (dd) to a terrorist organization <u>described in clause (vi)(III)</u>, or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

§ 1182(a)(3)(B)(iv)(VI) (emphasis added).[2] Prior to 2005, when the REAL ID Act of 2005 ("REAL ID Act"), Pub. L. No. 109-13, Div. B, 119

---

[2]This version of the relevant portion of the definition of "engage in terrorist activity" was added to the INA by the USA PATRIOT Act of 2001, Pub. L. 107-56, § 411, 115 Stat. 272, 346-47 (2001), 8 U.S.C. § 1182(a)(3)(B)(iv)(VI) (Supp. I 2001). Previously the relevant portion of the INA defining "engage in terrorist activity" provided:

As used in this chapter, the term "engage in terrorist activity" means to commit . . . an act of terrorist activity or an act which the actor knows, or reasonably should know, affords material support to any individual, organization, or government in conducting a terrorist activity at any time, including any of the following acts:

. . .

    (III) The providing of any type of material support, including . . . funds . . . to any individual the actor knows or has reason to believe has committed or plans to commit a terrorist activity.

. . . .

8 U.S.C. § 1182(a)(3)(B)(iii) (2000).

Stat. 231 (2005), was enacted, clause (vi)(III) defined "terrorist organizations" to mean, in addition to organizations formally designated as a terrorist organization,[3] an organization "that is a group of two or more individuals, whether organized or not, which engages in the activities described in subclause (I), (II), or (III) of clause (iv)." 8 U.S.C. § 1182(a)(3)(B)(vi)(III) (Supp. I 2001). Then and now, these three subclauses defined to "engage in terrorist activity" to mean "(I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity," "(II) to prepare or plan a terrorist activity," and "(III) to gather information on potential targets for terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(iv)(I), (II), (III) (Supp. I 2001); 8 U.S.C. § 1182(a)(3)(B)(iv)(I), (II), (III) (2006). Thus, prior to 2005, an organization qualified as a so-called undesignated terrorist organization only if it committed, planned, or gathered information for terrorist activities.

In 2005, the REAL ID Act amended clause (vi)(III) to broaden the definition of an undesignated terrorist organization to include an organization "which engages in . . . the activities described in

---

[3]The formal designation can be made either by the Secretary of State pursuant to section 1189 or by the Secretary of State in consultation with the Attorney General or the Secretary of Homeland Security, after making an appropriate finding. See § 1182(a)(3)(B)(vi)(I), (II).

subclauses (I) through (VI) of clause (iv). See REAL ID Act § 103(c) (emphasis added). By including subclause (VI) within the subclauses cross-referenced by clause (vi)(III), the amendment defined undesignated terrorist organizations to include those organizations that not only directly committed, planned, or gathered information for terrorist activities, but also indirectly supported such activities by affording "material support," including funds, to a terrorist organization. See § 1182(a)(3)(B)(iv)(VI).

Facts of Ramadan's visa applications. Ramadan is a well-known Swiss-born Islamic scholar whose work focuses on the integration of Muslim beliefs with Western European culture and society. Before August 2004, he traveled regularly to the United States, giving lectures at institutions such as Harvard and Princeton and to the State Department, and attending meetings and conferences. As a Swiss citizen, Ramadan was eligible to participate in the Visa Waiver Program, see § 1187, which permits citizens of certain countries to visit the United States for limited periods without obtaining a visa. Thus, Ramadan did not need to apply for a visa to enter the United States for these short engagements.

In January 2004, Ramadan accepted a tenured teaching position at the University of Notre Dame. Notre Dame submitted an H-1B visa on Ramadan's behalf, which was approved in May 2004. Ramadan made arrangements for the move, scheduled for early August 2004, but on

-8-

July 28, 2004, the United States Embassy in Bern revoked his visa without providing him an explanation. In response to press inquiries, a DHS spokesperson stated that the basis for the revocation was a provision of the INA that then permitted exclusion of prominent individuals who endorse or espouse terrorist activity.[4] See 8 U.S.C. § 1182(a)(3)(B)(i)(VII) (2000). The Government later denied that this "endorse or espouse" provision provided the grounds for the revocation.

The consulate advised Ramadan that he could re-apply for a visa. Notre Dame accordingly filed a second H-1B visa petition on October 4, 2004. By December 13, 2004, DHS had not yet acted on the second petition, and on that date Ramadan resigned from the position at Notre Dame. On December 21, 2004, having been informed about the resignation, DHS revoked the renewed H-1B petition. After this revocation, Ramadan could no longer take advantage of the visa waiver program that had authorized his previous temporary entries. See 8 U.S.C. § 1187(a)(9) (2006).

On September 16, 2005, Ramadan applied for a B visa to enter the United States for a short period of time to attend conferences, including events sponsored by Plaintiffs-Appellants AAR and AAUP. See Affidavit of Tariq Ramadan ¶ 28 (Mar. 10, 2006) ("Ramadan Aff. I"). [A

---

[4]See "Muslim Scheduled to Teach at Notre Dame Has Visa Revoked," Los Angeles Times, Aug. 25, 2004, at A23.

51] According to Ramadan, he was interviewed by consular and DHS officials at the United States embassy in Bern, Switzerland, on December 20, 2005. See id. ¶ 30. Defendants have submitted an affidavit from the official then serving as Consul in Bern stating that Ramadan was also interviewed in September 2005. See Declaration of John O. Kinder, ¶ 10 (May 22, 2007) ("Kinder Decl."). [A808-09] He was questioned about his political views and associations. See Ramadan Aff. I ¶ 30. Ramadan informed officials that, between 1998 and 2002, he had donated approximately $1,336 to ASP.[5] See Affidavit of Tariq Ramadan ¶¶ 10, 14 (Feb. 13, 2007) ("Ramadan Aff. II"). In August 2003, the Treasury Department had designated ASP as a terrorist organization due to its funding of Hamas, a designation that the Government acknowledges does not render an organization a "terrorist organization" under the INA. See Brief for Defendants-Appellees at 7 n*.

On January 25, 2006, the Plaintiffs-Appellants filed a suit in the District Court challenging Ramadan's ongoing exclusion from the United States. On March 15, 2006, they filed a motion for a preliminary injunction compelling the Defendants-Appellees either to

---

[5]Ramadan also reported in his December 2005 interview that he had donated money to the Comité de Bienfaisance de Secours aux Palestiniens ("CBSP") but later retracted the statement. The Government has acknowledged that these additional donations were not relevant to the decision to deny Ramadan's visa, and the District Court did not include them in its analysis.

grant Ramadan admission to the United States or at least make a decision on his visa application. On June 23, 2006, the Court ordered the Defendants-Appellees to issue a formal decision on the application within ninety days. See American Academy of Religion v. Chertoff, 463 F. Supp. 2d 400, 423 (S.D.N.Y. 2006).

Ramadan received a telephone call on September 19, 2006, and a letter shortly thereafter, informing him that the consulate had denied his petition because he had provided material support to a terrorist organization. Consular officials based this decision on a Security Advisory Opinion containing information from other United States agencies, Ramadan's interviews, and "additional information provided by Washington." Declaration of consular officer Aaron I. Martz ("Martz Decl.") ¶ 3 (July 13, 2007). With respect to the knowledge requirement of § 1182(a)(3)(B)(iv)(VI), Martz stated that "Mr. Ramadan knew, or reasonably should have known, that providing funds to a group would afford 'material support' to that group," and "in light of all the information available to me at the time I adjudicated the visa application, I concluded that Mr. Ramadan did not, and could not, demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that ASP . . . raised money for Hamas." Id.

District Court's decision on the merits. On December 20, 2007, the District Court, considering the parties' cross-motions for summary

-11-

judgment, granted the Defendants' motion and dismissed the amended complaint in a comprehensive and thoughtful opinion. See American Academy of Religion v. Chertoff, No. 06 Civ. 588, 2007 WL 4527504 (S.D.N.Y. Dec. 20, 2007) ("American Academy II"). Preliminarily, the Court noted that the "endorse and espouse" provision, § 1182(a)(3)(B)(i)(VII), originally cited by a DHS spokesperson as a basis for denial of Ramadan's visa, had been disavowed by the Government as a ground for the denial. See id. at *4. The Court then noted that "the doctrine of consular nonreviewability" precludes federal courts from exercising jurisdiction to consider an alien's challenge to a denial of a visa application. See id. at *5-*7 (citing, e.g., Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1181 (2d Cir. 1978); Rivera de Gomez v. Kissinger, 534 F.2d 518, 519 (2d Cir. 1976); Burrafato v. U.S. Dep't of State, 523 F.2d 554, 556 (2d Cir. 1975)).

The Court then discussed the Supreme Court's decision in Mandel, which recognized that United States citizens could invoke federal court jurisdiction to challenge a visa denial on the ground that the denial may have violated their First Amendment right to receive information, a right articulated in Stanley v. Georgia, 394 U.S. 557, 564 (1969). See American Academy II, 2007 WL 4527504, at *7-*10. The District Court pointed out that, although a First Amendment right could be asserted, that right is not violated as long as the consular official "'exercises [the power to exclude an alien] negatively on the

-12-

basis of a _facially legitimate and bona fide reason_.'" Id. at *9 (quoting Mandel, 408 U.S. at 770) (emphasis in District Court opinion).

Applying Mandel, the District Court made a three-part inquiry. The Court first asked whether the Government had provided a reason for the visa denial, and concluded that Ramadan's donations to organizations supporting known terrorist organizations was the Government's reason. See id. at *11. Second, the Court asked whether the Government had a statutory basis for its reason, and concluded that § 1182(a)(3)(B) was the statutory basis. See id. Third, the Court asked whether the cited provision had been properly applied to Ramadan, an inquiry that presented two further questions. See id. The first was whether the "material support" provision, § 1182(a)(3)(B)(iv)(VI), as expanded in 2005 by the REAL ID Act to include material support to an undesignated organization that funds a terrorist organization, see § 1182(a)(3)(B)(vi)(III) (incorporating activities described in clause (VI) of clause (iv) in the definition of "terrorist organization"), could be applied retroactively to Ramadan's contributions to ASP, made in 1998-2002. See American Academy II, 2007 WL 4527504, at *11. The second was whether Ramadan satisfied the knowledge requirement of the material support provision. See id.

With respect to retroactivity, the Court made the legal

-13-

conclusion that the "material support" provision applied to support given before the enactment of the amendment expanding the definition of an undesignated terrorist organization to include an organization that funded a terrorist organization. See id. at *11-*12. With respect to Ramadan's knowledge, the Court interpreted the material support provision to require the Government to show only that Ramadan knew he was giving money to ASP, and then placed on Ramadan the burden of satisfying the "unless" clause of the provision. See id. at *12-*14. The "unless" clause states that a visa applicant is ineligible under the material support provision "unless [he] can show by clear and convincing evidence that [he] did not know, and reasonably should not have known, that the organization [to which he provided funds] was a terrorist organization." § 1182(a)(3)(B)(iv)(VI)(dd).

With this understanding of the statutory knowledge requirement, the Court then appeared to make its own factual findings as to Ramadan's knowledge, rather than confine its inquiry to the adequacy of the findings reflected in the affidavit of the consular officer who informed Ramadan of the visa denial. The Court readily found that Ramadan knew he was giving money to ASP from his admission of this fact. American Academy II, 2007 WL 4527504, at *13. With respect to the "unless" clause, the Court considered three items of evidence tendered by Ramadan to the Court through affidavits. First was Ramadan's own statement that he did not know that ASP was supporting

-14-

Hamas and that his intent was only to provide humanitarian aid to Palestinian refugees. Although acknowledging that the statement "may well be true," the Court deemed it "self-serving," and "not ris[ing] to the level of clear and convincing evidence." Id. Second was the fact that, at the time of Ramadan's donations, ASP was "a verified and legitimate charity according to the Swiss Government." Id. Acknowledging that this statement might also be true, the Court stated that it also did not provide clear and convincing evidence that Ramadan was unaware of ASP's illegitimate activities. See id. Third was an expert's declaration that someone in Ramadan's situation would not have known that ASP was providing funding to Hamas. "This evidence," the Court stated, "while objectively illuminating, provides little comfort to the Court that Ramadan, subjectively, lacked the requisite knowledge." Id.

Ultimately, the Court was somewhat ambiguous as to whether it was finding the "unless" clause not satisfied by Ramadan's evidence or accepting the consular officer's findings. The Court stated that "Professor Ramadan has not demonstrated by clear and convincing evidence that he lacked knowledge of ASP's illicit activities," and also stated that "the consular official is . . . charged with the duty of determining whether the alien has met his or her burden. Once the consular official has made this decision, it is not the Court's role . . . to second guess the result." Id. at *14. The Court concluded

-15-

that the Government had provided a facially legitimate and bona fide reason for denying Ramadan's visa. See id.

Turning to the Plaintiffs'-Appellants' challenge to the constitutionality of the "endorse and espouse" provision, § 1182(a)(3)(B)(i)(VII), based on their apprehension that the existence of the provision would chill their First Amendment right to invite scholars to this country, the District Court stated that the claim raised only hypothetical possibilities of future exclusions, and denied the claim for lack of standing. See id. at *15.

## Discussion

The appeal presents a host of issues.

## I. Authority to review

The initial obstacle to the Appellants' First Amendment challenge to the visa denial is the Government's invocation of the doctrine of consular nonreviewability, the principle that a consular officer's decision to deny a visa is immune from judicial review. The Government considers this doctrine to mean that courts facing this type of challenge lack "jurisdiction," see Brief for Defendants-Appellees at 13, and this Court has also spoken of "jurisdiction" in rejecting review of a visa denial. See Wan Shih Hsieh, 569 F.2d at 1181 ("The district court correctly held that no jurisdictional basis exi[s]ts for review of the action of the American Consul in Taiwan suspending or denying the issuance of immigration visas to appellant's

-16-

children there.").

The Supreme Court has cautioned that the term "jurisdiction" is often used imprecisely, see Kontrick v. Ryan, 540 U.S. 443, 454-55 (2004). We do not believe that traditional subject matter jurisdiction is lacking in this case. The Plaintiffs allege that the denial of Ramadan's visa violated their First Amendment rights, and subject matter jurisdiction to adjudicate that claim is clearly supplied by 28 U.S.C. § 1331. See Abourezk v. Reagan, 785 F.2d 1043, 1050 (D.C. Cir. 1986) ("Abourezk II") ("The district court had subject matter competence in this case [involving visa denials] under both its general federal question jurisdiction, see 28 U.S.C. § 1331 (1982), and its specific jurisdiction over claims arising under the Immigration and Nationality Act, see 8 U.S.C. § 1329 (1982) [repealed]."), aff'd by an equally divided court, 484 U.S. 1 (1987); Burrafato v. U.S. Dep't of State, 523 F.2d 554, 557 (2d Cir. 1975) (noting that Mandel considered "an alleged violation of First Amendment rights of American citizens over which the federal courts clearly had jurisdiction") (emphasis added). Perhaps the doctrine of consular nonreviewability, where applicable, means that the generally available federal question jurisdiction provided by section 1331 to adjudicate First Amendment claims is withdrawn where the claim is based on a consular officer's denial of a visa, or that prudential considerations, perhaps arising from separation of powers concerns,

-17-

counsel against exercising normally available jurisdiction.

In this case, the Plaintiffs seek to overcome the doctrine of consular nonreviewability by relying on Mandel, in which the Supreme Court adjudicated on the merits, albeit to a limited extent, a First Amendment challenge to a visa denial. The Government contends that Mandel does not apply to this case because Mandel reviewed the Attorney General's discretionary decision not to waive an alien's inadmissibility, see Immigration and Nationality Act of 1952 § 212(d)(3)(A), 8 U.S.C. § 1182(d)(3)(A) (1970), rather than the consular officer's threshold decision that the alien was inadmissible.[6] The latter type of decision, the Government contends, is totally immune from judicial review.

Mandel does not provide a definitive answer to the Government's contention, since the Supreme Court understood the Mandel plaintiffs to have conceded that, in the absence of a discretionary waiver provision, there would be no First Amendment issue. The Court noted:

> In seeking to sustain the decision below, [the plaintiffs] concede that Congress could enact a blanket prohibition against entry of all aliens falling into the [excluded] class[es] . . ., and that First Amendment rights could not override that decision.

408 U.S. at 767. This statement lends some support to the

---

[6]The current version of the United States Code includes the substance of this provision with minor changes. See 28 U.S.C. § 1182(d)(3)(A) (2006).

Government's argument that the limited review required by the First Amendment applies only to the Attorney General's denial of a waiver.[7] On the other hand, the <u>Mandel</u> plaintiffs' concession, if that is what it was,[8] cannot have made any law, and can be viewed as merely relieving the Court of the need to decide whether a First Amendment claim requires at least some judicial review of a consular officer's visa denial.[9]

The case law in the aftermath of <u>Mandel</u> favors such review. The Ninth Circuit has explicitly rejected the Government's distinction, for purposes of permitting some judicial review of a constitutional

---

[7]Justice Douglas, in dissent, focused only on the Attorney General's waiver decision, contending that once the State Department had recommended a waiver, the statute giving discretion to the Attorney General should be construed to limit that discretion to "matters commonly within the competence of the Department of Justice—national security, importation of drugs, and the like." <u>Mandel</u>, 408 U.S. at 774 (Douglas, J., dissenting).

[8]Justice Marshall, in dissent, disputed such a concession. He understood the <u>Mandel</u> plaintiffs to "have simply noted . . . that even if this Court rejects the broad decision below, there would nevertheless be a separate and narrower basis for affirmance." <u>Mandel</u>, 408 U.S. at 780 n.4 (Marshall, J., with whom Brennan, J. joins, dissenting) (citations omitted).

[9]Since the grounds for denial of Mandel's visa were "advocat[ing] and "writ[ing] or publish[ing]" "the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship," 8 U.S.C. § 1182(a)(28)(D), (G)(v) (1964), and the three-judge court decision that the Supreme Court reviewed in <u>Mandel</u> had declared these grounds unconstitutional under the First Amendment, <u>see</u> <u>Mandel v. Mitchell</u>, 325 F. Supp. 620, 634 (S.D.N.Y. 1971), it was at least arguable that the visa denial, if reviewable, would have faced a more serious First Amendment challenge than the denial of a waiver.

-19-

claim, between a consular officer's denial of a visa and the Attorney General's denial of a waiver of inadmissibility. See Bustamante v. Mukasey, 531 F.3d 1059, 1062 n.1 (9th Cir. 2008). The First Circuit has done so implicitly, relying on Mandel to undertake the limited judicial review of a First Amendment challenge to a visa denial that the Court understood Mandel to permit. See Adams v. Baker, 909 F.2d 643, 647-50 (1st Cir. 1990); Allende v. Shultz, 845 F.2d 1111 (1st Cir. 1988). The D.C. Circuit has also implicitly rejected the Government's distinction between a visa denial and the Attorney General's decision not to waive inadmissibility. See Abourezk II, 785 F.2d 1043. Abourezk II accepted jurisdiction over First Amendment and statutory challenges to decisions of consular officers and the Secretary of State.[10] See id. at 1050.

Our Court has not had occasion to consider whether Mandel's

---

[10]Although dissenting from the majority's construction of the relevant statutes and concluding that the plaintiffs' constitutional claim lacked merit, Judge Bork accorded the plaintiffs "the limited judicial scrutiny defined by the [Mandel] standard." Abourezk II, 785 F.2d at 1075 (Bork, J., dissenting).

The Government endeavors to diminish the significance of Abourezk II by citing the D.C. Circuit's subsequent decision in Saavedra Bruno v. Albright, 197 F.3d 1153 (D.C. Cir. 1999). Although Saavedra Bruno pointed out that Mandel concerned the Attorney General's decision not to waive inadmissibility, whereas Abourezk II had concerned a consular officer's visa denial, the D.C. Circuit adhered to Abourezk II, see 197 F.3d at 1163; the challenge to the visa denial was not rejected for lack of jurisdiction, but because the plaintiffs had made no constitutional claims, see id.

allowance of limited judicial review of First Amendment claims is available on a challenge to a consular officer's visa denial, as distinguished from the Attorney General's denial of a waiver of admissibility. In Burrafato, we noted that district courts within this Circuit had "interpreted Mandel to require justification for an alien's exclusion." Burrafato, 523 F.2d at 556. We referred to decisions involving the Secretary of State's refusal to waive inadmissibility. See id. (citing MacDonald v. Kleindienst, 72 Civ. 1228 (S.D.N.Y. Oct. 10, 1972), and MacDonald v. Kleindienst, 72 Civ. 1228 (S.D.N.Y. May 6, 1974)). However, Burrafato did not need to resolve the issue because the plaintiff's challenge to the denial of her alien husband's visa application, in the absence of any constitutional claim, was dismissed for lack of jurisdiction. See id. at 557.

We conclude that, where a plaintiff, with standing to do so, asserts a First Amendment claim to have a visa applicant present views in this country, we should apply Mandel to a consular officer's denial of a visa. Since the First Amendment requires at least some judicial review of the discretionary decision of the Attorney General to waive admissibility, we see no sound reason to deny similar review to the decision of a consular officer to deny a visa. It seems counterintuitive to review a cabinet officer's discretionary decision, but not a consular officer's decision as to statutory ineligibility.

-21-

We agree with the explicit view of the Ninth Circuit and the implicit views of the First and D.C. Circuits supporting at least limited review where a visa denial is challenged on First Amendment grounds.

II. Scope of review.

We next consider the scope of the limited review permitted by Mandel. The Supreme Court there concluded:

> In summary, plenary congressional power to make policies and rules for exclusion of aliens has long been firmly established. In the case of an alien excludable under § 212(a)(28) [of the INA], Congress has delegated conditional exercise of this power to the Executive. We hold that when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.

Mandel, 408 U.S. at 769-70.

This formulation presents two questions: (a) what will render the Government's reason "facially legitimate and bona fide"? and (b) does the prohibition on "look[ing] behind" the decision mean that a reviewing court may not determine, after considering evidence, whether the facts support the Government's reason?

(a) The facial legitimacy of the reason. In Mandel, the Supreme Court provided no elaboration of "facially legitimate" or "bona fide." The reason given for denial of a waiver was that Mandel had exceeded the bounds of his visa on a previous visit to the United States. See id. at 759. The Court said only that with this statement of a reason,

-22-

"the Attorney General validly exercised the plenary power that Congress delegated to the Executive." Id. at 769. It should be noted that, unlike a visa denial, where statutory provisions specify grounds for inadmissibility, no statute specifies any grounds for the discretionary decision to decline to waive inadmissibility. The "reason" relied on in Mandel was what the alien had done, i.e., exceeded the bounds of a prior visa.

The decisions entertaining First Amendment challenges to visa denials after Mandel have concerned statutory grounds of inadmissibility. In Bustamante, the visa was denied pursuant to § 1182(a)(2)(C), which renders inadmissible an alien whom the consular officer has reason to believe has trafficked in a controlled substance. See Bustamante, 531 F.3d at 1060-61. The Ninth Circuit ruled that this was a facially legitimate reason because it was a statutory basis for inadmissibility. See id. at 1062 (citing § 1182(a)(2)(C)). The Court also ruled that the requirement of a "bona fide" reason was satisfied by the absence of an allegation that the consular officer "did not in good faith believe the information he had." Id.

In Adams, the visa was denied pursuant to 8 U.S.C. § 1182(a)(28)(F) (1988) (repealed), which rendered inadmissible aliens "who advocate or teach" various forms of terrorism. See Adams, 909 F.2d at 646. The consular officer determined that Adams fit within

that category `because of his advocacy of, and personal involvement with, IRA terrorist violence, including participation in bombings. See id. The First Circuit ruled that the statutory ground and the alien's conduct together provided the "facially legitimate and bona fide" reason for the visa denial.

In Abourezk II, the visas were denied pursuant to 8 U.S.C. § 1182(a)(27) (1982) (repealed), which rendered inadmissible aliens who "seek to enter the United States . . . to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety or security of the United States." The State Department determined that the aliens fit within that category "because of their personal status as officials of governments or organizations which are hostile to the United States." Abourezk v. Reagan, 592 F. Supp. 880, 888 (D.D.C. 1984) ("Abourezk I"). The D.C. Circuit appeared to assume that a statutory ground of inadmissibility and conduct by the visa applicant fitting within the statute would satisfy the Mandel standard, but remanded for reconsideration of whether the statutory ground had been properly construed. See Abourezk II, 785 F.2d at 1053-60.

We think the identification of both a properly construed statute that provides a ground of exclusion and the consular officer's assurance that he or she "knows or has reason to believe" that the visa applicant has done something fitting within the proscribed

-24-

category constitutes a facially legitimate reason. See § 1201(g); 22 C.F.R. § 40.6.  We also conclude, in agreement with the Ninth Circuit, that the absence of an allegation that the consular officer acted in bad faith satisfies the requirement that the reason is bona fide.

(i) Construction of the relevant statutory provisions.  The asserted statutory basis for the denial of Ramadan's visa was section 1182(a)(3)(B)(i)(I), which renders ineligible an applicant who "has engaged in a terrorist activity."  Subsection 1182(a)(3)(B)(iv)(VI)(dd) defines "engage in terrorist activity" to include "to commit an act that the actor knows, or reasonably should know, affords material support, including . . . funds . . . to a terrorist organization . . . described in clause (vi)(III) . . . unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization."  Clause (vi)(III) defines "terrorist organization" to mean "a group . . . which engages in . . . the activities described in subclauses (I) through (VI) of clause (iv)," which include funding a terrorist organization.  Three issues arise as to whether the consular officer properly construed and applied these statutory provisions to Ramadan.  These issues concern (A) retroactivity, (B) the knowledge requirement, and (C) the "unless" clause.

(A) Retroactivity.  The first issue concerns retroactivity.  The

-25-

Government acknowledges that, prior to enactment of the REAL ID Act in 2005, the "material support" provision of the INA did not apply to aliens who provided funds to what the Government calls "undesignated terrorist organizations" that in turn provided funds to terrorist organizations. See Brief for Defendants-Appellees at 33-34 n.*. It is undisputed that Ramadan's contribution of $1,336 to ASP, which in turn gave money to Hamas, occurred prior to 2005.

To support retroactive application of the REAL ID Act, the Government relies on the effective date provision of the Act, section 103(d), which provides that its amendments "shall apply to—(1) removal proceedings instituted before, on, or after the date of the enactment of this division; and (2) acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal occurring or existing before, on, or after such date." REAL ID Act § 103(d), 119 Stat. 272, 348 (emphases added). In the Government's view, the amendment clearly applies to Ramadan because his "act" (donating to ASP) is a ground of inadmissibility and occurred "before" the date of enactment.

The Appellants advance several arguments against this straightforward reading of the statute. First, they argue that the language of the Act's effective date provision, notably the caption of the provision, which reads simply "EFFECTIVE DATE," is not as clear as the comparable provision of the USA PATRIOT Act, Pub. L. No. 107-56,

-26-

§ 411(c), 115 Stat. 272, 348, which is captioned "RETROACTIVE APPLICATION OF AMENDMENTS." Brief for Plaintiffs-Appellants at 23-25. That argument is unavailing. If retroactive application of a statute is clear, such application is not defeated simply because in another statute Congress used language that is even clearer.

Second, the Appellants argue that the effective date provision of the REAL ID Act should be interpreted to mean that, although an act warranting exclusion might be covered even though it occurred before the effective date of the Act, the act must have constituted a ground of inadmissibility at the time it occurred. See id. at 25. However, that is not what the provision says. Moreover, it is highly unlikely that Congress intended to cover acts occurring before the effective date only if such acts were grounds of inadmissibility when they occurred. If the act had to be a ground of inadmissibility at the time it occurred, the language applying the statute to acts occurring before the effective date would have added nothing because the alien could not have been excluded on the basis of grounds that were added for the first time by the REAL ID Act.

Third, the Appellants argue that the Government's reading of section 103(d) renders subsection 103(d)(1) redundant. See id. at 26. Their point is that if the Act applies to all acts taken before, on, or after the effective date (the reading the Government gives to subsection 103(d)(2)), it necessarily applies to aliens who are in

-27-

removal proceedings instituted before, on, or after that date (as specified by subsection 103(d)(1)). They read the entirety of section 103(d) to apply only to aliens _in_ removal proceedings (by virtue of subsection 103(d)(1)), but as to those, it applies to acts occurring before the effective date (by virtue of subsection 103(d)(2)). Again, that is not what section 103(d) says. Moreover, as the Government points out, _see_ Brief for Defendants-Appellees at 38-39, the Appellants' reading would create the anomaly that the statute would apply to removal proceedings commenced as far back as April 1997 (when what used to be called deportation proceedings became removal proceedings, _see_ _Zhang v. INS_, 274 F.3d 103, 106 (2d Cir. 2001)), but would not apply to acts committed before the effective date.

The Government's reply does not really meet the Appellants' point that the Government's reading of subsection 103(d)(2) renders subsection 103(d)(1) redundant. The Government acknowledges that "there may be some overlap between subsections (1) and (2)," Brief for Defendants-Appellees at 38, but never provides an example of any situation covered by subsection (1) that is not already covered by subsection (2). Nevertheless, even if the subsections are redundant (and we need not determine whether they are), redundancy is not necessarily a fatal flaw and not a basis to disregard plain meaning. Even though subsection (2), fairly read, would render excludable any alien who had committed at any time an act covered by the REAL ID

-28-

amendments, including those already in removal proceedings on the effective date, Congress might well have wanted explicitly to bar any conceivable argument against applying the amendments to those in ongoing removal proceedings.

Finally, the Appellants argue that rendering Ramadan inadmissible for acts committed before the effective date of the REAL ID Act would create a substantial constitutional issue with respect to lawful permanent residents. They point out that the terrorism grounds for removal are identical to the terrorism grounds for exclusion, see § 1227(a)(4)(B) (incorporating exclusion grounds), and that the effective date provisions for the removal and exclusion amendments are identical, see REAL ID Act §§ 103(d), 105(b), 119 Stat. at 308-09. From the identity of these pairs of provisions, they argue that resident aliens, who have some due process rights (unlike Ramadan), would have a due process argument against removal for acts committed before their conduct was a ground for removal, and that the substantiality of that argument is a reason not to read the effective date provisions of either the exclusion or the removal provisions to apply to acts occurring before the effective date. The Government replies that the Plaintiffs have no standing to make that argument, see Brief for Defendants-Appellees at 44, and that the constitutional argument that could be raised by resident aliens is unavailing because the rational purpose test, applicable to civil statutes challenged on

-29-

retroactivity grounds, see Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 730 (1984), would be easily satisfied, see Brief for Defendants-Appellees at 44-45.

We think this argument need not be considered. Even if the Appellants are entitled to argue that the Government's reading would raise a constitutional issue as applied to others, it does not follow that a parallel provision that might be unconstitutional as applied to those who have due process rights must be read to avoid such an issue when applied to someone who lacks such rights.

In the end, the plain meaning of the "before, on, or after" phrase in subsection 103(d)(2) renders the REAL ID amendments applicable to Ramadan's acts occurring before 2005.

(B) Requirement of knowledge. The second statutory issue concerns what subsection 1182(a)(3)(B)(iv)(VI) requires with respect to an alien's knowledge. Clause (VI) has two knowledge components. First, it defines "engage in terrorist activity" to mean "to commit an act that the actor knows, or reasonably should know, affords material support . . . to a terrorist organization described in clause (vi)(III)."[11] Second, clause (VI) bars an alien with such knowledge "unless [he] can demonstrate by clear and convincing evidence that

_____

[11]As we have already explained, see [page 7], supra, clause (vi)(III) includes an organization, not formally designated as a terrorist organization, that provides funds to a terrorist organization.

-30-

[he] did not know, and should not reasonably have known, that the organization was a terrorist organization." § 1182(a)(3)(B)(iv)(VI)(dd).

The District Court recognized that the combination of clause (VI) and its subclause (dd) identifies two aspects of an alien's knowledge: what knowledge the alien must have had in order to be ineligible for a visa and what knowledge the alien must show by clear and convincing evidence that he lacked in order to be eligible for a visa. The District Court construed clause (VI) to mean that the first reference to knowledge meant only that Ramadan knew that he had given money to ASP, a requirement easily satisfied by Ramadan's admission that he had done so. American Academy II, 2007 WL 4527504, at *13. The District Judge then moved immediately to the second reference to knowledge (the "unless" clause) and considered whether Ramadan had satisfied his burden to demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization to which he had given money was a terrorist organization. See id. There is no dispute in this case that ASP provides material support to Hamas or that Hamas is a terrorist organization. The issue is whether the first knowledge component is satisfied if, at the time of his donations, Ramadan knew only that he was giving funds to ASP or requires that he also knew that ASP was a terrorist organization.

The Appellants contend that the District Court misinterpreted the

-31-

statute by excluding from the first inquiry whether Ramadan knew that ASP was a terrorist organization, i.e., knew that ASP was providing material support to Hamas. The Government resists this interpretation, contending that it would eliminate the "unless" clause:

> If the Government were required to establish that an alien knew his actions would provide material support to a group he knew was a terrorist organization, as plaintiffs contend, then by definition, the alien could never establish by clear and convincing evidence that he did not know the group was a terrorist organization.

Brief for Defendants-Appellees at 31.

It is not immediately apparent how the two statutory references to knowledge in clause (VI) should be interpreted. There is a surface plausibility to the Government's argument: the "unless" clause would have little meaning if it were available only after the consular officer found, after considering evidence from the alien and the Government, that the alien knew that the recipient of his donations was a terrorist organization (because it had funded a terrorist organization).[12] On the other hand, under the Government's reading of the statute, the first knowledge component could similarly be said to

---

[12]It should be noted, however, that the "unless" clause would have significant meaning if the first knowledge component of clause (VI) was read to require knowledge that the recipient of funds was a terrorist organization and also meant that the consular officer should first determine, before hearing from the alien, only whether there existed a prima facie case that the alien knew that the organization he had funded was a terrorist organization.

have little meaning in a case like Ramadan's. If Congress was requiring only the visa applicant's knowledge that he had given money to an organization, even if he did not know that the recipient was a terrorist organization, the first knowledge requirement would mean very little. Although it is possible to imagine a situation where a person who has given money to an organization does not know that he has done so, it is unlikely that Congress created the first knowledge requirement for such a limited purpose.

When the first knowledge requirement is considered in most of its applications, however, it retains considerable meaning, under the Government's construction, in the many instances where the material support is non-monetary, such as communications. See § 1182(a)(3)(B)(iv)(VI); Singh-Kaur v. Ashcroft, 385 F.3d 293, 298 (7th Cir. 2004) (considering, under pre-2005 version of INA, "whether [alien's] conduct in providing food and setting up tents constituted 'material support'" under the statute); see also In re S-K-, 23 I. & N. Dec. 936, 943-44 (B.I.A. 2006) (discussing what constitutes material support under INA), reaffirmed by 24 I. & N. Dec. 475 (B.I.A. 2008). Congress could well have wanted to require that a person rendering non-monetary support know only that his actions "afford material support," even if he does not know that the recipient is a terrorist organization.

The Government's construction of the first knowledge component

-33-

becomes more plausible when clause (VI) is compared to clauses (IV) and (V), which also include an "unless" clause. Unlike clause (VI), clauses (IV) and (V) do not contain any initial knowledge component. Clause (IV) renders ineligible an alien who solicits funds for a terrorist organization, and clause (V) renders ineligible an alien who solicits membership in such an organization. Congress did not require the alien's knowledge that the organization for which he solicited funds or members was a terrorist organization. In these clauses, Congress rendered the alien ineligible simply for the <u>act</u> of soliciting funds or members for a terrorist organization, but, with respect to an undesignated terrorist organization, provided the alien with the opportunity to show by clear and convincing evidence that he did not know that the undesignated organization he was helping was a terrorist organization. <u>See</u> § 1182(a)(3)(B)(iv)(IV)(cc), (V)(cc). This comparison strongly suggests that in clause (VI) Congress similarly did not require knowledge that the recipient of an alien's material support was a terrorist organization, but provided the alien only the defense of subclause (VI)(dd).

The Government's construction of the first knowledge component becomes even more plausible when subclause (VI)(dd), applicable to Ramadan, is compared to subclause (VI)(bb). Subclause (VI)(bb) renders ineligible an alien who affords material support "to any individual who [he] knows, or reasonably should know, has committed or

-34-

plans to commit a terrorist activity." § 1182(a)(3)(B)(iv)(VI)(bb). Thus, subclause (bb) explicitly requires knowledge that the individual whom the alien has aided is engaged in terrorist activity. Interpreting the first knowledge component of clause (VI) to require knowledge of the terrorist nature of the recipient of material support would lead to the odd reading of subclause (VI)(bb) whereby there would be first a requirement that the alien knew he was rendering material support and then two requirements that the alien knew that the individual recipient was engaged in terrorist activity.

We are mindful of the Supreme Court's recent decision in Flores-Figueroa v. United States, 129 S. Ct. 1886 (2009), which interpreted the knowledge requirement of 18 U.S.C. § 1028A(a)(1). That provision requires a mandatory consecutive two-year sentence if, during the commission of other crimes, the defendant "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." The Court ruled that the knowledge requirement applied to all elements of the provision, that is, that the defendant must know not only that what he possessed was a means of identification, but must also know that the means of identification belonged to another person (as distinguished from a fake means of identification). See id. at 1894. As the Court explained, "As a matter of ordinary English grammar, it seems natural to read the statute's word 'knowingly' as applying to all the subsequently listed

-35-

elements of the crime." Id. at 1890. See also Model Penal Code § 2.02, explanatory note ("The requirement of culpability applies to each 'material element' of the crime."). But the Court recognized that "the inquiry into a sentence's meaning is a contextual one," id. at 1891, a point emphasized in the concurring opinion of Justice Alito. See id. at 1895-96 (Alito, J., concurring). He cited with apparent approval courts of appeals' decisions ruling that 18 U.S.C. § 2423(a), which makes it unlawful to "knowingly transpor[t] an individual under the age of 18 years in interstate or foreign commerce . . . with intent that the individual engage in prostitution" does not require knowledge that the victim was not 18. See id. at 1895-96 (citing, e.g., United States v. Griffith, 284 F.3d 338, 350-51 (2d Cir. 2002); United States v. Taylor, 239 F.3d 994, 997 (9th Cir. 2001)). Justice Alito also cited with apparent approval decisions ruling that 8 U.S.C. § 1327, which prescribes punishment for any person who "knowingly aids or assists any alien inadmissible under section 1182(a)(2) (insofar as an alien inadmissible under such section has been convicted of an aggravated felony) . . . to enter the United States," does not require knowledge that the assisted alien had been convicted of an aggravated felony. See id. at 1896 (citing United States v. Flores-Garcia, 198 F.3d 1119, 1121-23 (9th Cir. 2000); United States v. Figueroa, 165 F.3d 111, 118-19 (2d Cir. 1998)).

Although the issue is not free from doubt, we are persuaded that

-36-

the normal approach discussed in <u>Flores-Figueroa</u> does not apply to the first knowledge component of clause (VI) of subsection 1182(a)(3)(B)(iv). That subsection must be read, in context, as an integrated whole, and the comparisons we have discussed between clause (VI) and clauses (IV) and (V), and between subclauses (VI)(bb) and (VI)(dd) powerfully indicate that the first knowledge component of clause (VI) requires only knowledge that the alien knew he was rendering material support to the recipient of his support. <u>Cf</u>. <u>Nijhawan v. Holder</u>, 129 S. Ct. 2294, 2301-02 (2009) (construing subparagraph (M)(i) of INA § 1101(a)(43) by reference to other subparagraphs of subsection (43)).

(C) <u>The "unless" clause.</u> The third statutory issue concerns the proper application of the "unless" clause. This clause specifies the circumstance under which an alien can exclude himself from § 1182(a)(3)(B)(iv)(VI)(dd), which would otherwise render him ineligible for a visa because he provided material support to a terrorist organization "unless [he] can demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization." The existence of the opportunity for the visa applicant to prove that he lacked actual or constructive knowledge that the recipient of his funds was a terrorist organization implies that, before a decision on the visa application is made, the alien must be confronted with the

-37-

allegation that he knew he had supported a terrorist organization. Otherwise, he has no way of understanding what it is that he must show he did not know or should not have known.

We have agreed with the Government that Clause (VI) imposed no requirement that the consular officer find that Ramadan knew that ASP had funded Hamas, and that ASP was therefore itself a terrorist organization. But the "unless" clause, properly construed, required the consular officer to confront Ramadan with the claim that he knew that his donations to ASP constituted material support to a terrorist organization because it had funded Hamas, and then afford him the opportunity to negate such knowledge.[13] Ramadan's case is different from typical situations, likely contemplated by Congress in enacting the "unless" clause, where the recipient of funds is a terrorist organization because of its own terrorist activities. <u>See</u> § 1182(a)(3)(B)(iv)(I)-(III). ASP is a conduit for funds to Hamas. Thus, for Ramadan to have a meaningful opportunity to negate knowledge, he had to be confronted with the claim that he knew or should have known that ASP provided funds to Hamas.

---

[13]We have no occasion to consider how the "unless" clause should be interpreted in a case where, because of criminal or security grounds, the consular officer uses the authority provided in section 1182(b)(3) not to inform a visa applicant of an adverse determination or the specific provisions under which a determination of inadmissibility was made. In Ramadan's case, he was notified of the adverse determination and the provisions under which it was made.

Our record is unclear as to whether the consular officer confronted Ramadan with a claim that he had knowingly supported a terrorist organization, ASP, before affording him an opportunity to satisfy the "unless" clause. The Declaration of Martz, the consular officer, does not say that he did so. What the record thus far discloses are the following circumstances. On July 28, 2004, Ramadan's H-1B visa was "prudentially" revoked. See Kinder Decl., ¶ 7. "Prudential" revocation occurs when some derogatory information is received, but the revocation is not a determination of inadmissibility. See id. ¶¶ 5, 6. On August 25, 2004, a spokesperson for the DHS stated publicly that the visa had been revoked "because of a section in federal law that applies to aliens who have used a position of prominence within any country to endorse or espouse terrorist activity." See Ramadan Aff. II ¶ 6.

In September 2005, Ramadan applied for a B1/B2 non-immigrant visa at the U.S. Embassy in Bern. He was interviewed at the Embassy in December (and perhaps in September as well), where he was asked questions. See Ramadan Aff. II ¶ 8. As far as the current record discloses, his only prior awareness of grounds for inadmissibility was the 2004 claim, since abandoned, that he had endorsed or espoused terrorism.

On September 19, 2006, Martz denied the visa because of "Ramadan's provision of material support to undesignated terrorist

organizations, ASP and CBSP."[14] See Kinder Decl. ¶12. Nearly a year after being interviewed in Bern, Ramadan learned for the first time from Kinder's letter dated September 19, 2006, that the visa had been denied because of Ramadan's donations to organizations "which you knew, or reasonably should have known, provided funds to Hamas." Martz has stated the following concerning Ramadan's knowledge:

> With respect to Mr. Ramadan's relevant knowledge, I concluded that:
>
> (a) Mr. Ramadan knew, or reasonably should have known, that providing funds directly to a group would afford "material support" to that group . . .; and
>
> (b) . . . Mr. Ramadan did not, and could not, demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that ASP . . . raised money for Hamas.

See Martz Decl. ¶ 3.[15]

However, when the officer stated that Ramadan did not satisfy the "unless" clause, he gave no indication that he had confronted Ramadan with the claim that Ramadan knew that ASP funded Hamas. Without such an indication, we have no way of knowing whether the officer correctly applied the "unless" clause, and hence the proffered reason for the

_____

[14]The Government seems to place no reliance on donations to CBSP, donations that Ramadan has denied. See [page 10 n.5], supra.

[15]Whereas the District Court thought the first component of the knowledge requirement concerned only whether Ramadan knew that he had contributed money to ASP, the consular officer properly understood that component to require that Ramadan knew that providing money to ASP would afford material support to ASP.

-40-

denial has not yet been shown to conform to the relevant statute and to be facially legitimate.[16]

The need to confront Ramadan with a claim that he knew ASP funded Hamas is especially important in this case because of the timing of Ramadan's contributions. Ramadan's contributions were made between 1998 and 2002, before the Government officially listed ASP as a "Specially Designated Global Terrorist" in 2003. See Press Release, U.S. Dep't of Treasury, Office of Public Affairs, "U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities" (August 22, 2003). That designation was motivated in part by the fact that "too many innocent donors who intend for their money to be used to provide humanitarian services here or abroad, are unwittingly funding acts of violence when these funds are diverted to terrorist causes." Id. Thus, Ramadan's claim that he lacked the requisite knowledge cannot be dismissed out of hand. Moreover, Ramadan had previously been told that he was suspected of being inadmissible because of the "endorse or espouse" provision. He therefore had no reason to think, in the 2005 interview, that he needed to negate knowledge that he knew ASP had funded Hamas.

---

[16]In requiring adequate indication that the "unless" clause was properly applied, we point out that, while consular officers should apply the clause properly in all instances of visa applications, judicial review of whether proper application occurred is limited to cases cognizable in a federal court under Mandel.

Confronting him with a claim of knowledge was necessary to make the "unless" clause meaningful, especially in a case where Ramadan, now alerted to the Government's claim, has evidence negating his knowledge, at the time he made contributions to ASP, that ASP had funded Hamas.

In construing the "unless" clause to require confronting the visa applicant with the allegation of the knowledge he needs to negate, we are not requiring the consular officer to conduct a mini trial. It will suffice for the consular officer to state the knowledge alleged to render the visa applicant ineligible and then afford the applicant a reasonable opportunity to present evidence endeavoring to meet the "clear and convincing" negation of knowledge.[17] Unless the allegation

---

[17] In assessing the applicant's evidence, we would expect the consular officer to avoid the District Court's apparent rejection of Ramadan's denial of knowledge as "self-serving." When a person's knowledge is at issue, that person's denial of knowledge, though obviously self-serving, is not for that reason automatically lacking in evidential weight. The denial might, in appropriate circumstances, be found not credible, but, if credible, it is probative and should be considered along with all other evidence bearing on knowledge. See In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 37 F.3d 804, 838 (2d Cir. 1994) ("It is well established that a person's state of mind is a fact question to be proved the same as any other fact. . . . [E]vidence [of state of mind] cannot be excluded on the ground that it is self-serving.") (citations omitted), rev'd on other grounds by Zicherman v. Korean Airlines, 516 U.S. 217 (1996).

The Foreign Affairs Manual helpfully advises consular officers that "your assessment of the credibility of an applicant's response to questions concerning possible provision of material support to a terrorist organization can be the key factor in determining whether the alien is inadmissible." 9 U.S. Department of State, Foreign

of knowledge has been conveyed to the applicant prior to his appearance before the consular office, it will normally be advisable to afford the applicant at least a brief opportunity to return with his available evidence.[18]

We will therefore remand to afford the Government an opportunity to ascertain whether the consular officer can assure the District Court that he confronted Ramadan with the allegation of knowledge that ASP had funded Hamas and provided him some opportunity thereafter to negate such knowledge, or, if not, to conduct a renewed visa hearing

_____

Affairs Manual ("FAM") § 40.32, N1.2 (Note) (May 3, 2005).

[18]The Department of State might wish to consider amending the Foreign Affairs Manual to make clear the consular officer's responsibilities in properly applying the "unless" clause. That manual currently states:

> In cases where consular officers must determine whether an alien knows or should have known that an organization is a terrorist organization, officers must consider several factors. First, facts particular to the individual, such as his or her residence, profession, or education, may permit a conclusion that the applicant[] knows, or should have known, that the organization is a terrorist organization. Secondly, officers must consider whether information about the organization is so widely known in the area that most persons know that the organization is engaged in terrorist activities. Other factors may also be relevant. . . .

FAM § 40.32, N2.3 (Note) (May 3, 2005).

The Manual does not advise that the officer should confront the alien with an allegation of knowledge that the recipient of his funds is a terrorist organization before affording him an opportunity to satisfy the "unless" clause.

now that Ramadan is aware of the knowledge he must negate.

(b) <u>The adequacy of evidence to support the reason.</u> The second issue concerning scope of review is whether, on a First Amendment challenge to a visa denial, a reviewing court need only satisfy itself that the conduct alleged fits within the statutory provisions relied upon as the reason for the visa denial, or may determine if there is evidence that either supports the reason or at least supports the consular officer's reasonable belief that the reason exists. <u>See</u> § 1201(g).

<u>Mandel</u> appears to foreclose any inquiry as to supporting evidence by stating that courts will not "look behind" the decision of the Executive Branch. <u>See</u> 408 U.S. at 770. This statement was made with respect to the Attorney General's decision to deny a waiver of inadmissibility. The Court did not explicitly state whether the decision of the consular officer to deny the visa was similarly insulated from an evidentiary inquiry, but nothing in the Court's opinion suggests that such inquiry would be permitted. The absence of an explicit statement precluding an evidentiary inquiry as to the consular officer's decision appears to be due to the <u>Mandel</u> plaintiffs' concession that the Government was entitled to "conclude that Dr. Mandel's Marxist economic philosophy falls within the scope of" subsection 212(a)(28)(D), which rendered inadmissible an alien who advocates "the economic, governmental, and international doctrines of

-44-

world communism." See id. at 756 n.3.[19]

The court of appeals' decisions entertaining First Amendment challenges to visa denials have varied as to the appropriateness of an evidentiary inquiry into whether the facts support the consular officer's reason. In Bustamante, the Ninth Circuit made no inquiry as to whether the facts supported the consular officer's conclusion that the visa applicant was a drug trafficker. Acknowledging that Bustamante denied drug trafficking, see 531 F.3d at 1062, the Court stated, "Under Mandel's limited inquiry, the allegation that the Consulate was mistaken about [Bustamante's] involvement with drug trafficking . . . fails to state a claim upon which relief could be granted." Id. at 1063.

In Adams, the First Circuit made some examination of evidence proffered by the Government, but did so only for the limited purpose of determining whether the evidence was sufficient "to support a finding of 'reasonable belief'" that the visa had been denied on a valid statutory ground. See Adams, 909 F.2d at 649. Although the

---

[19]In dissent, Justice Marshall decried the Court's unwillingness to take "[e]ven the briefest peek" behind the reason for the Attorney General's waiver denial. See id. at 778 (Marshall, J., with whom Brennan, J. joins, dissenting). In his view, the Attorney General's reason—that Mandel had exceeded the terms of his prior visa—was completely unsupported by the record and put in issue by the Department of State's acknowledgment that Mandel "'may not have been aware of the conditions and limitations attached to the [previous] visa issuance.'" Id. (quoting Department's letter to Mandel's counsel).

-45-

District Court had made findings that the visa applicant made statements providing a facially legitimate basis for his exclusion, the First Circuit declined to review those findings, concluding only that "the State Department had competent evidence upon which it could reasonably find that Adams participated in terrorist activities." Id. at 648 n.4.

In Abourezk II, the D.C. Circuit's ruling explicitly concerned only the issues of statutory interpretation. The Court concluded that the District Court had erred in its construction of the provision under which the visa had been denied. See Abourezk II, 785 F.2d at 1053-1060. Nevertheless, the Court of Appeals appears to have contemplated some examination of evidence underlying the reason for the visa denial. At the outset the Court stated that "questions of material fact remain." Id. at 1047. Later the Court expressed concern about the District Court's reliance on "in camera ex parte evidence," id. at 1060, and cautioned the Court, in the proceedings on remand, "to make certain that plaintiffs are accorded access to the decisive evidence to the fullest extent possible, without jeopardizing legitimately raised national security interests," id. (emphasis added).

Two district court decisions declined to make any inquiry as to evidence supporting reasons for a visa denial. In El-Werfalli v. Smith, 547 F. Supp. 152 (S.D.N.Y. 1982), the Court initially ruled

that the reasons provided for a visa denial were "so general," id. at 154, that examination of classified materials was required to determine if the specific reasons fit within the statutory ground of inadmissibility. Having satisfied itself that they did, however, the Court undertook no examination of evidence to determine whether the facts supported the asserted reasons. The Court noted that the Mandel standard permits the Court "to inquire as to the Government's reasons, but proscribes its probing into their wisdom or basis." Id. at 153 (emphasis added); see also Azzouka v. Sava, 777 F.2d 68, 76 (2d Cir. 1985) (noting with approval the "procedures and standards applied in El-Werfalli").

Similarly, in Abourezk I, prior to the D.C. Circuit's remand because of disagreement as to construction of the relevant statutory ground of inadmissibility, see Abourezk II, 785 F.2d at 1053-1060, the District Court examined the Government's in camera submission only to identify the Government's particularized reason, in light of the "conclusory" reason that the aliens' entry "'would have been prejudicial to the conduct of the foreign affairs of the United States,'" Abourezk I, 592 F. Supp. at 886 (quoting affidavit of Under Secretary of State). There was no inquiry as to whether the particularized reason—that the aliens were officials of governments or organizations hostile to the United States—was factually supported. See id. at 888. See also NGO Committee on Disarmament v. Smith, 1982

-47-

U.S. Dist. LEXIS 13583 (S.D.N.Y.) (June 10, 1982) (Leval, J.) (inquiry as to specific reasons for exercise of discretion not to waive inadmissibility, but not as to evidence supporting reasons), aff'd mem., 697 F.2d 294 (2d Cir. 1982).

The Appellants endeavor to draw support for an evidentiary inquiry from the First Circuit's decision in Allende. However, that decision declared a visa denial invalid because the supporting affidavit made clear that the denial had been based on the applicant's prior speeches, activity that the Court ruled was an impermissible basis under then-existing law. See Allende, 845 F.2d at 1120-21. The Court had no occasion to consider whether the proffered reason was supported by evidence.

The Appellants urge an evidentiary inquiry in reliance on decisions that did not concern visa denials. They contend that our Court required "some degree of factual review," Reply Br. for Appellants at 8 n.5, in Bertrand v. Sava, 684 F.2d 204 (2d Cir. 1982). However, that decision, involving discretionary denials of parole for aliens with pending asylum applications, required only a record indicating that discretion had been exercised, and stated that the parole denials would be upheld even on the assumption that some of the reasons for the denials were "inaccurate." See id. at 213. Nevertheless, our Court did not fault the District Court for taking evidence, some of which appears to have concerned whether the District

Director's reasons were factually supportable. What required reversal of the District Court's decision rejecting the denials of parole was our Court's conclusion that the District Judge had substituted his judgment for that of the District Director. See id. at 213-18. Ultimately, we remanded, not for an evidentiary inquiry, but to permit the District Director to exercise his discretion again in light of changed circumstances.[20] See id. at 219.

More persuasive is the Tenth Circuit's decision in Marczak v. Greene, 971 F.2d 510 (10th Cir. 1992), concerning denial of parole pending exclusion proceedings. On review of the parole denial decision, the Court applied the Mandel standard of a "facially legitimate and bona fide" reason. See id. at 516-17. In doing so, the Court said that it was "tempting to conclude from the broad language of the test that a court applying the 'facially legitimate and bona fide' standard would not even look to the record to determine whether the agency's statement of reasons was in any way supported by the facts." Id. at 517. However, the Court rejected such a restricted

_____

[20]Some uncertainty as to the approach used in Bertrand is created by Judge Kearse's concurring opinion, in which she stated, "To the extent that the district court was making credibility assessments, its review was consistent with the strictures of Kleindienst v. Mandel, 408 U.S. 753 (1972)." Bertrand, 684 F.2d at 220 (Kearse, J., concurring). It is not clear whether the credibility assessment concerned the District Director's testimony presenting the reasons for his exercise of discretion or his testimony about the facts supporting those reasons.

review and concluded that the District Director's decision to deny parole "must be at least reasonably supported by the record," id., and remanded to afford the Director an opportunity to persuade the District Court that the reasons for the decision were "factually supportable," id. at 519.

Somewhat helpful to the Appellants, but less supportive than Marczak, is the First Circuit's decision in Amanullah v. Nelson, 811 F.2d 1 (1st Cir. 1987), which also concerned review of a decision denying parole pending exclusion proceedings. The Court appears to have equated Mandel's standard of "a facially legitimate and bona fide reason" with an "abuse of discretion" standard, implying that some inquiry is permissible to see if the reasons advanced are not arbitrary in the sense of lacking at least some factual support. However, the Court confined judicial inquiry to the facts appearing in the administrative record, see id. at 17, and rejected the aliens' claim to an evidentiary hearing in the District Court, see id. at 16-17.

The Ninth Circuit's decision in Nadarajah v. Gonzales, 443 F.3d 1069 (9th Cir. 2006), also cited by the Appellants, is less helpful. First, the Court stated that if "a facially legitimate and bona fide reason" is given for a denial of parole pending immigration proceedings, "the denial of parole is essentially unreviewable." Id. at 1082. Second, in granting parole, the Court ruled that continued

-50-

detention after five years was unlawful and that the evidence favoring release was undisputed. See id. at 1083.

We doubt that the judicial decisions reviewing administrative denial of parole are even applicable to consular denial of a visa. Although several courts purport to apply the Mandel standard when reviewing denials of parole, the parole and visa decisions are significantly different. Parole concerns release from detention; a visa concerns admission into this country. It is understandable that some courts exercising habeas jurisdiction would make at least a limited factual inquiry as to a local District Director's ground for confining an alien. But a similar inquiry does not seem appropriate concerning the visa decisions of consular officers stationed throughout the world.

We conclude that we have to take literally the statement in Mandel that courts may not "look behind" exclusion decisions, whether the decision is the Attorney General's exercise of discretion to waive inadmissibility or the consular officer's decision that a statutory ground of inadmissibility applies to the visa applicant, at least in the absence of a well supported allegation of bad faith, which would render the decision not bona fide. Thus, to whatever extent the District Court may have assessed Ramadan's evidence negating knowledge, it exceeded its proper role.

III. The "Endorse or Espouse" Provision

The only remaining issue is the District Court's dismissal of the challenge to the "endorse or espouse" provision. The Court correctly rejected this claim for lack of standing.

## Conclusion

Since Ramadan's undisputed conduct—making donations that he knew afforded material support to ASP—fits within the statute relied upon to deny him a visa, the only issue requiring a remand is further consideration of whether the consular officer properly construed and applied the "unless" clause of § 1182(a)(3)(B)(iv)(VI)(dd) by confronting Ramadan with the allegation that he knew that ASP provided funds to Hamas and then providing him with a reasonable opportunity to demonstrate, by clear and convincing evidence, that he did not know, and should not have reasonably known, of that fact. Accordingly, we remand for further proceedings consistent with this opinion.